**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LINDA S. NOTTER,
Plaintiff-Appellee,

v.

NORTH HAND PROTECTION, a division
of Siebe, Incorporated,
Defendant-Appellant.

No. 95-1087

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Matthew J. Perry, Jr., Senior District Judge.
(CA-92-1846)

Argued: January 31, 1996

Decided: June 21, 1996

Before WILKINS, NIEMEYER, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion. Judge Wilkins wrote a
dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Richard James Morgan, MCNAIR & SANFORD, P.A.,
Columbia, South Carolina, for Appellant. Herbert Wiley Louthian,
Sr., LOUTHIAN & LOUTHIAN, Columbia, South Carolina, for
Appellee. **ON BRIEF:** Leslie S. Rogers, MCNAIR & SANFORD,
P.A., Columbia, South Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Linda Notter brought a Title VII sex discrimination case against her employer, North Hand Protection, a Division of Siebe North, Inc. (North Hand), alleging that she had been discriminated against because of her pregnancy, childbirth, or related medical conditions.[1] A jury found in her favor and awarded her $30,581.00 in back pay, $10,000.00 "for future pecuniary losses, inconvenience, mental [anguish], or loss of enjoyment of life," and $50,000.00 in punitive damages. North Hand seeks to set aside the jury verdict on several grounds. Because none of North Hand's contentions has merit, we affirm.

_____

[1] Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer

> to fail or refuse to hire or to discharge any individual, or other-
> wise to discriminate against any individual with respect to his
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin.

42 U.S.C. § 2000e-2(a)(1).

The Pregnancy Discrimination Act of 1978 provides that:

> The terms "because of sex" or "on the basis of sex" include, but
> are not limited to, because of or on the basis of pregnancy, child-
> birth, or related medical conditions; and women affected by
> pregnancy, childbirth, or related medical conditions shall be
> treated the same for all employment-related purposes, including
> receipt of benefits under fringe benefit programs, as other per-
> sons not so affected but similar in their ability or inability to
> work.

42 U.S.C. § 2000e(k).

2

I.

In September 1990, North Hand (a glove manufacturer) hired Notter as a full-time secretary for its plant in Clover, South Carolina. Before then she had worked for North Hand part time. North Hand conducts regular performance reviews of its employees, rating them on a scale of zero to four, zero being low and four being high. In January 1991 Notter received her first performance review and scored a 2.08, a rating of "Competent." According to North Hand's personnel policy,

> COMPETENT indicates consistent overall performance which meets all standards. Deficiencies in some aspects may be offset by merit in others, making an overall level of competence. Only with thorough training and experience should an incumbent be expected to perform at this level.

Notter's immediate supervisor (and plant manager), Steve Grigg, conducted the January 1991 review. In "review comments" placed in Notter's personnel file, Grigg wrote, "Linda Notter has been a pleasant addition to the Clover office staff. Her performance, attitude and personality have enhanced the office operation." According to Grigg's post-review comments, he rated Notter more highly than Notter rated herself. Grigg wrote, "Linda should make Clover an excellent Secretary/Receptionist. She is overall an excellent trainee."

In preparation for Notter's second performance review on April 2, 1991, Grigg noted, "Linda continues to be very efficient in meeting her job duty requirements. She has learned most of her job requirements in a very short time. Her work is accurate and neatly prepared." Notter therefore received another good performance review and her performance rating increased to 2.73. Grigg rated her performance as "Advanced," and according to North Hand's personnel policy,

> ADVANCED indicates training, experience, ability, and individual initiative combining to achieve performance which consistently exceeds job standards and requirement [sic]. An incumbent should not be expected to attain this level of task performance until well established and experienced in the job.

3

Notter's second review meeting (in April 1991) lasted about 45 minutes, about half as long as her first. By all accounts Notter was a splendid employee who was well liked by her co-workers and who was performing her job responsibilities adequately.

In May 1991, a month after her second review, Notter learned she was pregnant. Notter's doctor, Malcolm Marion, III, called her at work to give her this news. North Hand's employment supervisor, Barbara Beamguard, was present when Notter received the call. Notter immediately told Beamguard what the call was about and asked her what Grigg would think. According to Notter, Beamguard told her that Grigg "probably wouldn't be too happy, because I [Notter] just started my job." Moreover, Notter's pregnancy would require her to miss work at the plant's profit calculation time, the busiest time of the year for Grigg.

Notter did not tell Grigg right away about the pregnancy. She testified, "I was afraid to tell him, at that time. I just kept it to myself until I got up enough courage to go tell him myself." Grigg learned of the pregnancy in June, and Notter explained how:

> I hadn't been feeling too good. I must have looked tired or something. Because everybody asked me what was wrong?
>
> And we had come in after lunch, I was sitting at my desk. And I was kind of tired. And I didn't feel too good. And Steve [Grigg] had been coming in from lunch and asked me, you know, what was wrong.
>
> And he had just -- and I said, you know, I just really wasn't feeling well.
>
> He started walking back toward his office and just turned around and said, well, you are not pregnant; are you?
>
> And at that time I wasn't -- he was going to soon enough find out, so I just said: yes.

Grigg then asked Notter if she had been using birth control, if she knew who the father was, if she knew where the father was, and what

4

her parents thought about her being pregnant and unmarried. These questions upset Notter a great deal. She was able to hold her feelings in check until the end of the working day, but she cried for her entire 35-minute drive home. When she arrived home, she called Dr. Marion and told him what had happened. Dr. Marion told her it was important for her to reduce her stress level at that stage of her pregnancy, and he told her she should stay home from work for five days. Dr. Marion filled out and signed a medical excuse form for Notter. The written excuse did not disclose any medical justification for Notter's missing work, but no one at North Hand told Notter that the excuse was inadequate. Indeed, North Hand treated this five-day absence as excused.

Notter received another performance review on September 4, 1991. Her overall rating once again increased, this time to 3.05, another "Advanced" rating. She did receive a "one" (a low) rating in the attendance category because of the days she missed in June after Grigg upset her with his comments about her pregnancy. She received ratings of "three" in the categories of dependability, aptitude, initiative/adaptability, judgment, and work habits. She received ratings of "four" in the categories of punctuality and attitude. She also received a 3.09 rating in the most heavily weighted category, productivity. Grigg's pre-review comments to the personnel file once again gave Notter glowing marks, but Grigg also noted that she was "an expectant unwed mother." According to Grigg's post-review notes, the review meeting "[s]urprisingly [ ] lasted for 1 1/2 hours."

Notter went on maternity leave on December 28, 1991. Notter submitted to North Hand a maternity leave form signed by Dr. Marion. Notter went into labor on January 9, 1992, and Dr. Marion admitted her into the hospital. Notter's labor was difficult, and Dr. Marion engaged an obstetric surgeon, Dr. Pratibha Raut, to deliver the baby by caesarian section. Before Dr. Raut began to operate, the anesthesiologist attempted to give Notter a spinal anesthetic. The anesthesiologist injected Notter fifteen times in her back, but none of these attempts to introduce the anesthetic were successful. Eventually, Dr. Raut decided to perform the caesarian under a general anesthetic. Raut delivered Notter of a healthy baby girl on January 10, 1992.

As a result of the failed attempt to administer a spinal anesthetic, Notter suffered from severe back pain. Between January and March

5

1992, Notter received chiropractic treatment for her back troubles. At trial Beamguard testified that she knew Notter was being treated for back problems and that Notter had made claims under her employee insurance policy for that treatment.

In spite of her back pain and the time she needed to care for her new baby, Notter occasionally came in to the Clover plant to train and assist the temporary secretary who was covering for her. Notter received no pay for helping the temporary secretary, whom North Hand hired as a permanent employee after firing Notter.

Near the end of Notter's scheduled maternity leave time, Notter was still not feeling well. She saw Dr. Marion on February 28 and told him that she was not quite ready to return to work. Dr. Marion wrote an excuse on a prescription pad saying simply,"Please extend Linda's leave." When Notter brought the excuse to the plant, Beamguard said it was inadequate. According to Beamguard, a valid excuse had to contain a medical reason for the extension of leave and a date that Notter would be able to return to work.

In fact, North Hand's maternity leave policy provides:

> The period of disability, during which the employee is unable to work and is eligible for weekly benefits provided by group insurance, is determined by the attending physician in each case.

> The company has no arbitrary or pre-determined schedule for either the timing or duration of maternity leave of absence.

North Hand's general leave policy also allows the company to demand that the employee submit to a physical examination by a physician selected by the company, but at no time did Beamguard (or any other company official) ask Notter to submit to such an examination.

Furthermore, North Hand allows employees to take unpaid personal leaves of absence for up to six months for"illness of a family member, health problems affecting the employee but not qualifying

6

as a disability nor compensable by group insurance, or other case of personal hardship."

Beamguard claimed that she tried to call Dr. Marion to ask him for a medical reason to extend Notter's leave, but that Dr. Marion never returned her calls. Beamguard called Dr. Raut's office, but did not speak to Dr. Raut personally. Dr. Raut's secretary filled out a "Certificate to return to work or school," and sent it to Beamguard at the plant. The form stated that Notter was under Dr. Raut's care and that Notter "is able to return to work/school on 02-26-92" (emphasis supplied). The form was dated March 13, 1992. Dr. Raut never saw the form, nor did she sign it. Apparently, Dr. Raut's secretary signed it. Furthermore, Dr. Raut only saw Notter once between January 10, 1992, the date of the caesarian section, and March 13, 1992, the date Beamguard got the "return to work" certificate from Dr. Raut's secretary. That visit was when Dr. Raut removed Notter's stitches. It occurred on January 17, 1992, one week after the caesarian and two months before the "return to work" certificate was issued.

Grigg wrote Notter a letter, dated March 16, 1992, saying that he was accepting Notter's "voluntary termination," effective March 6, 1992. Notter became distraught when she received the letter, and her mother called the plant to find out "why this had happened with no warning." An unidentified North Hand employee told Notter's mother "flat out that [what] Steve [Grigg] wanted was Linda [Notter] to call and beg for her job back." Notter's mother then called Dr. Marion to tell him what had happened, but when Dr. Marion spoke to Beamguard on March 19, 1992, Beamguard denied that Notter had been fired. Notter, of course, had been fired a few days before.

North Hand appeals from the judgment entered on the jury's verdict in favor of Notter, asking us to reverse the judgment or to grant a new trial.

II.

North Hand first challenges the jury's finding that Notter was the victim of intentional discrimination. We believe, however, that there is sufficient evidence to support the jury's determination.

7

During trial a Title VII plaintiff must prove by a preponderance of the evidence "the ultimate issue . . . whether the defendant intentionally discriminated against" her. Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir.) (appeal after bench trial) (internal quotations omitted), cert. denied, 116 S. Ct. 380 (1995). Once a jury has rendered its decision, its verdict may be set aside only "if the plaintiff has failed to adduce substantial evidence in support of his claim." DeMaine v. Bank One, Akron, N.A., 904 F.2d 219, 220 (4th Cir. 1990) (per curiam); accord Whalen v. Roanoke County Bd. of Supervisors, 797 F.2d 170 (4th Cir. 1986) (en banc). On appeal we examine all of the evidence in the light most favorable to Notter, the party seeking to sustain the verdict, and we draw all reasonable inferences in her favor. Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1350 (4th Cir. 1995). In conducting our review, we are "prohibited from weighing the evidence or assessing the credibility of witnesses." Id.

A plaintiff in a discrimination action may prove her case by circumstantial evidence. One way she may do so is to establish by a preponderance of the evidence (1) that she was in the protected class, (2) that she was subjected to some adverse employment action, such as discharge, (3) that she was performing her job at a level that met her employer's legitimate expectations, and (4) that she was replaced by someone of comparable qualifications outside the protected class. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); EEOC v. Western Elec. Co., 713 F.2d 1011, 1014 (4th Cir. 1983). Under this mode of proof, the plaintiff also must establish by a preponderance of the evidence that (5) the employer's asserted justification for taking adverse employment action was merely pretextual, and (6) "that discrimination was the real reason" behind the adverse employment action. St. Mary's Honor Ctr. v. Hicks, 125 L. Ed. 2d 407, 422 (1993). See also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Nevertheless, with respect to elements (5) and (6), "rejection of the defendant's proffered reasons is enough at law to sustain a finding of discrimination." St. Mary's Honor Ctr., 125 L. Ed. 2d at 418-19 n.4 (emphasis in original).

It is undisputed that Notter was subject to adverse employment action by being fired. It is also undisputed that Notter was performing her job at a level that met her employer's legitimate expectations. Indeed, her steadily improving performance reviews reveal that she

8

was exceeding company expectations. Notter also was replaced by someone outside the protected class. (Her replacement later became pregnant but was not pregnant when she was hired to replace Notter.) Finally, it is undisputed that Notter's replacement was of comparable qualifications -- after all, Notter helped to train her. North Hand claims, however, that Notter was not in the class protected by the Pregnancy Discrimination Act and that she did not sustain her burden of proving pretext and discrimination.

A.

North Hand argues that Notter failed to establish that she was in the protected class because she failed to establish that her medical conditions related to delivery by caesarian section were incapacitating. In support of this argument, North Hand relies on a non-Title VII case, Barrash v. Bowen, 846 F.2d 927, 931 (4th Cir. 1988) (per curiam). In Barrash we said in dicta without any citation of authority, "Under the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), pregnancy and related conditions must be treated as illnesses only when incapacitating."

The text of the Pregnancy Discrimination Act contains no requirement that "related medical conditions" be"incapacitating." And a careful examination of Barrash and other cases cited by North Hand reveals that those cases do not compel the reading of such a requirement into the statute. In Barrash we held that the federal government did not violate the plaintiff's rights under the Constitution and a collective bargaining agreement by denying her six months of maternity leave for breastfeeding. The Barrash plaintiff was fired when she refused to return to work after she had been given five months of leave to breastfeed her child. Barrash stands for the narrow proposition that breastfeeding is not a medical condition related to pregnancy or to childbirth. See also Wallace v. Pyro Mining Co., 789 F. Supp. 867 (W.D. Ky. 1990) (same), aff'd 951 F.2d 351 (6th Cir. 1991) (table).[2]

_____

[2] In its unpublished opinion the Sixth Circuit in Wallace did not say that only incapacitating medical conditions are covered under the Pregnancy Discrimination Act; it merely noted that the plaintiff "failed to produce evidence supporting her contention that breastfeeding her child was a medical necessity." 1991 WL 270823, **1.

9

Similarly, in <u>Barnes v. Hewlett Packard Co.</u>, 846 F. Supp. 442, 445 (D. Md. 1994), it was held that medical conditions of the newborn child are not childbirth-related medical conditions within the meaning of the Pregnancy Discrimination Act. None of these cases control the situation presented here: we have a new mother with a <u>bona fide</u> medical problem directly related to the specific circumstances of her delivery.

Moreover, the <u>Barrash dicta</u> aside, the jury easily could have found that Notter suffered from an incapacitating medical condition related to her pregnancy. She suffered from back problems caused directly by childbirth: she received fifteen spinal injections in preparation for her caesarian section, and she had severe back pain for long after her baby was born. The records of her several weeks of chiropractic treatment support a finding that Notter was incapacitated as a result of complications relating to her caesarian delivery. Finally, Beamguard testified that she knew Notter was suffering from back problems because Beamguard reviewed the chiropractic bills Notter submitted to the company for insurance coverage.

In any event, Notter introduced sufficient evidence at trial to show that she was in the protected class, that is, she established that she had medical conditions related to childbirth.

B.

More difficult to resolve is the question of whether Notter adduced sufficient evidence of pretext and discrimination. Viewing the evidence in its entirety, however, we believe that a jury could reasonably find in favor of Notter. The jury could have reasonably disbelieved North Hand's claim that Notter was fired for failing to supply the company with an adequate medical reason for remaining on maternity leave. Because the jury could have disbelieved North Hand's asserted rationale, the verdict must stand. <u>St. Mary's Honor Ctr.</u>, 125 L. Ed. 2d at 418-19 n.4.

1.

North Hand allowed Notter to believe that she could rely on her attending physician's decision that she be allowed to remain on leave.

10

The company's disability leave of absence policy provides that authorization for leave "is based on a statement from an attending physician that the employee is unable for medical reasons to perform his or her normal job or any other work for which qualified and which can be provided by the company." The policy does not, however, expressly indicate that an employee who is properly on maternity leave must submit any new "medical justification" with her doctor's statement requesting that the leave be extended.

By its own terms, North Hand's policy provides that the duration of maternity leave is left to the discretion of the woman's "attending physician." An "attending physician" is the physician that the patient sees most regularly. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Here it is beyond question that Dr. Marion was Notter's attending physician and that North Hand knew or should have known that he was. Dr. Marion told Notter that she was pregnant, and Beamguard was with Notter when she received that phone call from Dr. Marion. Dr. Marion authorized Notter's five-day leave early in her pregnancy, and the company knew that Dr. Marion was the doctor who authorized the leave. Dr. Marion also authorized Notter's maternity leave in December, and North Hand accepted that written authorization. Dr. Marion cared for Notter throughout her pregnancy and after she gave birth.[3] Finally, Dr. Marion wrote the excuse Notter gave to Beamguard in March asking for extended maternity leave.[4]

_____

[3] Dr. Marion shared a medical practice with his father, Dr. Malcolm Marion, Jr., who occasionally cared for Notter. In his deposition, read into evidence at trial, the younger Dr. Marion characterized both himself and his father as Notter's attending physicians.

[4] Notter's medical condition was disputed at trial, and the jury returned a general finding of discrimination. Dr. Marion's February 28 notes refer both to "bonding" and to "stinging around incision." Beamguard testified that she knew Notter was receiving chiropractic treatment and that Notter told her she had birth-related pain in her side. The critical fact, however, is that Dr. Marion never told anyone at North Hand before Notter was fired that she could return to work. Dr. Marion (the attending physician) wrote an excuse for extended leave, and a reasonable reading of North Hand's maternity leave policy indicates that it contains two key elements: (1) "no arbitrary or pre-determined schedule for either the timing or duration of maternity leave," and (2) the length of leave "is determined by the attending physician in each case."

11

Dr. Raut was not Notter's attending physician. Dr. Marion called Dr. Raut in as a specialist only when it became clear that Notter required a caesarian section. Dr. Raut's only contact with Notter related to the particulars of that surgical procedure, and to no other aspect of her pregnancy.

Certainly it is reasonable for an employer to require that there be some legitimate medical rationale for an employee to remain on maternity or disability leave. Otherwise, employers would face the problems of employee malingering or making fraudulent claims of disability. But the company here did not require any "medical reason" listed on the excuse it accepted from Notter in June, when she took five days off. Nor did North Hand exercise its rights under its leave policy to require Notter to submit to a physical, as it could have done had it truly believed that Notter was malingering. These facts support the jury's finding of pretext and discrimination. **5**

_____

Furthermore, it is one thing to say that the company's reading of its maternity leave policy was reasonable, and quite another thing to say that the company's reading was the only reasonable reading. The question presented is not how, at some abstract level, the terms of the policy may best be parsed. Notter's reading of the policy was not strained and was firmly grounded in plain language to the effect that the attending physician determines the length of leave. Moreover, the jury could have found that the company's interpretation of its policy came about only as a post hoc rationalization for the decision to fire Notter. Beamguard, for example, testified that Notter's situation was unique, so there is no basis to say that North Hand simply applied its policy as it always had. The company's argument would carry more weight if there was some evidence of how North Hand applied the policy to previous employees in Notter's situation (i.e., where a new mother's doctor wrote an excuse without disclosing on the form itself the particular medical justification for the excuse), but Notter's case was the first.

**5** In any event, Notter's claim does not stand or fall with her medical condition because the jury could have found that she was discriminated against (1) because of her pregnancy, or (2) because of her childbirth, or (3) because of medical conditions related to her pregnancy or childbirth. See 42 U.S.C. § 2000e(k).

12

2.

The employer's initial reaction upon learning of the employee's pregnancy can be circumstantial evidence of pretext and intent to discriminate. See Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1485 & 1491-92 (10th Cir. 1994); Thompson v. La Petite Academy, Inc., 838 F. Supp. 1474, 1477-78 (D. Kan. 1993); Gallo v. John Powell Chevrolet, Inc., 765 F. Supp. 198, 211 (M.D. Pa. 1991); EEOC v. Ackerman, Hood & McQueen, Inc., 758 F. Supp. 1440, 1453 (W.D. Okla. 1991), aff'd 965 F.2d 944 (10th Cir.), cert. denied, 113 S. Ct. 60 (1992); cf. McDonnell Douglas, 411 U.S. at 804 (employer's "reaction, if any," upon learning of plaintiff's civil rights activities is relevant to show pretext and discrimination).

The jury could have accepted Notter's, rather than Grigg's, characterization of their conversation on the day Grigg learned Notter was pregnant. According to Notter, Grigg asked her a number of intrusive questions, questions indicating a lack of sensitivity to her condition. In addition, Grigg's questions to Notter (whether she was using birth control, whether she knew who the father was, and what her parents thought of the unplanned pregnancy) indicate that he disapproved of her for getting pregnant. Grigg also noted in Notter's personnel file that Notter was "an expectant unwed mother." The jury could have inferred from these comments that Grigg disapproved of Notter, was disappointed in her, and did not wish to work with her any longer, and that he therefore discriminated against her. Beamguard was more candid than was Grigg when she learned that Notter was pregnant. The jury could have found that Beamguard told Notter that Grigg would be unhappy about the pregnancy because Notter would have to take time off work. Beamguard's statement also lends support to a finding of discrimination.

Grigg's attitude is precisely what the Pregnancy Discrimination Act was intended to combat. "[T]he assumption that women will become [pregnant] and leave the labor force leads to the view of women as marginal workers, and is at the root of the discriminatory practices which keep women in low-paying and dead-end jobs." H.R. Rep. No. 948, 95th Cong., 2d Sess. 3 (1978), reprinted in 1978 U.S.C.C.A.N. 4749, 4751. When, by his statements, an employer indicates that he subscribes to this erroneous assumption, a jury may

13

properly infer intent to discriminate if, as in this case, the record contains other corroborative evidence.

3.

Finally, the manner by which the defendant fired Notter is evidence of pretext and intent to discriminate. Beamguard procured a return to work form that had not been signed by a doctor, but by a secretary in the office of a doctor who was not even Notter's attending physician.[6] Notter's mother testified that a North Hand employee said that Grigg wanted Notter to "beg" for her job back. Neither Beamguard nor Grigg called Notter to tell her that her job was in jeopardy, nor did they even call her to tell her she had been fired. Instead, Grigg sent her a letter with the self-serving language, "I have to accept your voluntary termination." Finally, when Dr. Marion asked Beamguard if Notter had been fired, Beamguard denied the fact, indicating an effort to avoid inquiry into the true cause of Notter's discharge.

4.

Substantial evidence supports the jury's finding that North Hand intentionally discriminated against Notter because of her pregnancy, childbirth, or related medical conditions. North Hand's departure from its attending physician rule, Grigg's insensitivity to Notter upon learning of her pregnancy, and North Hand's method of firing Notter suggest intentional discrimination. Because Notter is entitled on appeal to the benefit of all favorable inferences the jury reasonably could have drawn, we uphold the verdict.

III.

North Hand next challenges two instructions the court gave to the jury. A trial court need not give any particular formulation of the law, so long as its charge is correct and understandable. See United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992), cert. denied, 506 U.S. 1066 (1993). On appeal, the district court's formulation of instruc-

_____

[6] The dissent describes this form as "Dr. Raut's release." However, the first time Dr. Raut saw the paper was at her deposition, at which time she denied signing it.

14

tions is reviewed for abuse of discretion, keeping in mind that the ultimate goal of jury instructions is to give the jury a clear understanding of the law it must apply. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir. 1996); see generally Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 4.23 (1986). We believe the instructions were proper.

A.

The district court charged, "Plaintiff has the burden of proving that she lost her job because of her pregnancy or because of her childbirth or because of a medically related reason." North Hand claims this instruction was erroneous because it did not indicate that a medical condition must be incapacitating for the plaintiff to be within the class protected by the statute.

According to North Hand, the district court should have charged:

> Under the Pregnancy Discrimination Act of 1978, Amendments to Title VII, pregnancy and related conditions must be treated as illnesses only when incapacitating. In order for the Plaintiff to show a violation, there must be a medical disability caused or contributed to by pregnancy and recovery therefrom, or a "related medical condition." Such things as breast-feeding and weaning, bonding, or the desire to stay home are not medical disabilities or "related medical conditions" covered under the law. If you find that the reason for Plaintiff's absence from work after being released from treatment was a non-medical reason, you must find for the Defendant.

North Hand's proposed charge would not have accurately stated the law, given the limited applicability of Barrash v. Bowen, discussed supra at II.A. The court's charge that a condition must be a medical condition related to pregnancy was adequate to inform the jury of the law relevant to this case.

B.

The second instruction challenged by North Hand relates to the appropriate measure of damages in an employment discrimination case.

15

The district court instructed the jury:

> You must also consider and reduce any back pay otherwise allowable by the amount of money that she has earned since her separation from the Defendant's employ, or the amount that she could have earned with reasonable diligence. This reduction from back pay in the law is called mitigation of damages. The Plaintiff was required to make reasonable efforts to mitigate her back pay damages.

North Hand asked for the following instruction:

> You must also consider and reduce any back pay otherwise allowable by the amount of money she earned since her separation from employment or the amounts she could have earned with reasonable diligence. This reduction from back pay, in the law, is called mitigation of damages. Ms. Notter was required to make reasonable efforts to mitigate back pay damages. If you find that plaintiff failed to make a reasonable effort to seek available positions for which she was qualified, you should not award back pay damages. Similarly, if you find that her full-time commitment as a student would preclude her from accepting employment equivalent to her position at Siebe North, you should not award her back pay damages.

The district court's charge accurately stated the law. 42 U.S.C. § 2000e-5(g)(1) provides in relevant part, "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." The court did not abuse its discretion by refusing to refer specifically to Notter's attending school. Indeed, undue emphasis upon particular facts or particular principles of law can be reversible error if such emphasis creates the potential of misleading the jury. See Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 685 n.11 (4th Cir. 1995), cert. denied, 64 U.S.L.W. 3637 (1996). There was no error in the district court's charge.

16

IV.

According to the defendant, a new trial must be ordered on the issue of damages because the jury award of $30,581.00 in back pay was excessive. We disagree.

After Notter was fired, she received a total of $7,421 in unemployment benefits. In June 1992 she began attending school at night. She also helped her father care for her mother after her mother became sick in February 1993. The defendant argues that the jury failed to consider these facts when calculating the award of back pay.

An award of damages must stand unless "no substantial evidence is presented to support it, it is against the clear weight of the evidence, it is based upon evidence that is false, or it will result in a miscarriage of justice." Barber v. Whirlpool Corp., 34 F.3d 1268, 1279 (4th Cir. 1994).

The record discloses that while Notter was receiving unemployment benefits she looked for work twice a week. Notter testified that because she went to school at night, being in school did not interfere with her ability to take a job. She also testified that taking care of her mother did not interfere with her ability to work because her father helped to care for her mother.

While employed with North Hand, Notter earned $17,409 annually, plus insurance benefits worth $286.61 monthly. Notter's unlawful termination caused her to lose a total of $1,737.36 per month that she otherwise would have earned (($17,409/12) + $286.61). Notter was fired (retroactively) to March 6, 1992. Judgment was entered in her favor on August 2, 1994. At most, she could receive back pay for the two years and five months between termination and judgment. Sands v. Runyon, 28 F.3d 1323, 1328 (2d Cir. 1994). Therefore, if no evidence of failure to mitigate damages had been presented, Notter could have been awarded $50,383.44 ($1,737.36 x 29). After subtracting the amount Notter received in unemployment compensation, $7,421, the maximum award could have been $42,962.44.

After hearing all the evidence North Hand presented as to Notter's activities after she was fired and as to unemployment compensation

17

she received, the jury awarded her $30,581.00, or 71 percent of the maximum award. The jury weighed North Hand's mitigation evidence and awarded Notter a sum that was not excessive. We affirm the award of back pay.

V.

North Hand challenges the award of punitive damages on the ground that the district court should have instructed the jury that such damages must be established by clear and convincing evidence (rather than by a preponderance of the evidence, as the district court did instruct). In any event, North Hand says there was insufficient evidence to support a finding that it acted with malice or with reckless indifference toward Notter's rights under the Pregnancy Discrimination Act.[7] We disagree with North Hand's contentions, and accordingly we affirm the award of punitive damages.

A.

North Hand argues that state law should determine the standard of proof on the question of punitive damages. Under South Carolina law, punitive damages must be proven by clear and convincing evidence. S.C. Code § 15-33-135. North Hand relies on 42 U.S.C. § 1988(a), which provides:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses

---

[7] 42 U.S.C. § 1981a(b)(1) provides that a plaintiff "may recover punitive damages under [Title VII] . . . if [she] demonstrates that the [defendant] engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights."

18

> against law, the common law, as modified and changed by
> the constitution and statutes of the State wherein the court
> having jurisdiction of such civil or criminal cause is held, so
> far as the same is not inconsistent with the Constitution and
> laws of the United States, shall be extended to and govern
> the said courts in the trial and disposition of the cause, and,
> if it is of a criminal nature, in the infliction of punishment
> on the party found guilty.

(Emphasis supplied.)

We believe the statute's use of the term "deficient" means that state law may be invoked only in circumstances where remedies under federal law are less protective of civil rights than are remedies under state law. In discrimination cases brought under federal law, punitive damages need be proven only by a preponderance of the evidence. Bird v. Figel, 725 F. Supp. 406, 412 (N.D. Ind. 1989); Patrykus v. Gomilla, 1989 WL 8610, *3 (N.D. Ill. 1989); Norris v. City of Easton, 1989 WL 49520, *3 (E.D. Pa. 1989). We are aware of no authority to the contrary. Because wrongdoers are more likely to be assessed punitive damages under a preponderance of the evidence standard than under a clear and convincing standard, federal law is not "deficient" within the meaning of 42 U.S.C. § 1988(a). Cf. 29 U.S.C. § 2651(b) (Family and Medical Leave Act of 1993 shall not "supersede any provision of any State or local law that provides greater family or medical leave rights than the rights established under this Act").

We recognize that punitive damages awards should be carefully circumscribed, so as not to become vehicles for unbridled retribution. The statute, however, already addresses these concerns in two ways: (1) by providing that punitive damages may be awarded only in cases where the defendant either acts maliciously or out of reckless indifference toward the plaintiff's federally-protected rights and (2) by providing for caps on damages awards. See 42 U.S.C. § 1981a(b)(3). We see no need to impose additional limits on punitive damages when Congress could have done so, but did not.

The district court properly instructed the jury on Notter's burden of proving punitive damages.

19

B.

According to North Hand, the record does not contain substantial evidence that it acted out of malice or with reckless indifference to Notter's federally-protected rights. North Hand primarily points to the fact that both Grigg and Beamguard attended Notter's baby shower. We believe the record does contain substantial evidence to support the punitive damages award. The jury could have inferred malice or reckless indifference from the insensitive manner in which Notter was fired (out of the blue, without so much as a phone call to warn her that her job was in jeopardy); from the testimony that Grigg wanted Notter to beg for her job back; from Beamguard's procuring a "return to work" certificate from the secretary of a doctor who was not Notter's attending physician and who had not seen Notter for two months; and from Beamguard's telling Dr. Marion that Notter had not been fired, when in fact she had.

VI.

The judgment is affirmed in its entirety.

AFFIRMED

WILKINS, Circuit Judge, dissenting:

While I fully appreciate, and indeed share, the reluctance of the able trial judge to set aside the jury verdict, I feel compelled to dissent because the evidence was not sufficient to support a conclusion that North Hand terminated Notter because of her pregnancy.

I agree with the majority that the evidence supports a conclusion that Notter established a prima facie case of discrimination by proving that she was a member of a protected class (pregnant); that she was performing her duties satisfactorily; that she suffered an adverse employment decision (termination); and that she was replaced by someone outside the protected class (someone who was not pregnant). North Hand maintains, however, that it established a nondiscriminatory reason for the termination--that company policy provided that termination would result if an employee failed to return from a dis-

20

ability leave within five days of release. Since North Hand's proffered reason for Notter's termination unquestionably constitutes a legitimate nondiscriminatory basis for her dismissal, Notter may not prevail unless she carried her burden of showing that the company's proffered reason was a pretext and that the true reason for dismissal was discriminatory, i.e., based on pregnancy, childbirth, or a related medical condition. See St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2753-54 (1993).

The majority agrees with Notter that the evidence she presented was sufficient to support a conclusion that she carried this burden. According to the majority, the jury properly could have inferred that North Hand's proffered reason for the termination was a pretext and that the true reason for her dismissal was discriminatory from five circumstances: (1) Beamguard's comment to Notter when she first learned of the pregnancy that Grigg would not be happy about her absence during the busiest portion of the year; (2) Grigg's unprofessional reaction when Notter disclosed her pregnancy to him; (3) Grigg's reference to Notter in an evaluation as an unwed, expectant mother; (4) Beamguard's and Grigg's purported misapplication of the leave policy; and (5) the circumstances surrounding Notter's termination.

In my view, the first three circumstances, even in combination, are insufficient to support a finding of pretext and discrimination. Undoubtedly, Beamguard's and Grigg's initial reactions to the announcement of Notter's pregnancy were insensitive. Title VII, however, prohibits only adverse employment actions taken for a discriminatory reason; it does not mandate either that employers greet with pleasure news that a key employee will be absent from the office during a busy time of the year or that employers behave in the most understanding manner in dealing with difficult social situations. While evidence of an employer's reaction properly may be considered as relevant evidence of an intent to discriminate, Beamguard's and Grigg's reactions to the announcement of Notter's pregnancy, as well as Grigg's reference to Notter as an unwed mother is counterbalanced by the undisputed facts that Grigg did not terminate Notter immediately and in fact awarded Notter the highest performance evaluation that she received during her employment with North Hand months after he learned of her pregnancy--in spite of the low score she

21

received for attendance due to her absenteeism. Certainly, Notter's performance evaluations would not have continued to rise if Grigg possessed an intention to discriminate against her.

The question becomes, then, whether a jury reasonably could have concluded that North Hand's application of its leave policy or the circumstances surrounding the termination were pretextual. North Hand's disability leave of absence policy provided:

> I. <u>Definitions</u>:
>
> A. Disability Leave of Absence
>
> Any absence from work because of non job-related injuries or illnesses for which the employee receives compensation and benefits under this policy. . . .
>
> B. Short-term Disability (STD)
>
> The first twenty-six week period of absence for which an employee is authorized and receives pay and benefits under this policy. Company authorization is based upon a statement from an attending physician that the employee is unable for medical reasons to perform his or her normal job or any other work for which qualified and which can be provided by the company.

J.A. 616. Under this policy it is the employee's duty to keep a supervisor advised of circumstances necessitating an absence from duties as far in advance as possible. With respect to returning from a disability leave of absence, the policy provides:

> <u>If the employee fails to return</u> (or to make himself or herself available to return) <u>to work within five working days of the date of termination of weekly [disability] insurance benefits, he or she will be considered voluntarily terminated and will be replaced. . . . [Further,] failure to advise the company of medical release from disability within five days of such release will constitute voluntary termination of employment.</u>

22

J.A. 619 (emphasis added). Notter was no longer entitled to disability benefits once she was able to perform the duties of her employment; she was released to perform these duties six weeks **1** after the delivery of her daughter (by February 26); thus, her failure to report to work within five days after the expiration of this six-week period constituted a voluntary termination.

Notter acknowledges that under the disability leave provisions her failure to return to her duties was properly treated as a voluntary termination. However, she nevertheless claims that her termination was improper because she was on maternity leave rather than disability leave. Although she admits that she was receiving disability payments (for which she concedes she was no longer eligible in the absence of a medical excuse), Notter contends that the cessation of these payments did not terminate her maternity leave as it would a disability leave. Instead, she asserts, under the maternity leave policy only the attending physician's written statement could end the leave.

The maternity leave policy provides:

> I. <u>Policy</u>
>
> A. Maternity Leave of Absence is provided for female employees disabled because of pregnancy.
>
> B. <u>Reinstatement to original job</u> or a position of like status and pay, retention of seniority, and <u>eligibility for benefits provided in Disability Leave of Absence Policy . . . apply equally to all non job-related disabilities, whether or not the disability is related to pregnancy.</u>
>
> C. <u>The period of disability, during which the employee is unable to work and is eligible for weekly benefits provided</u>

_____

**1** The majority opinion does not make clear that it is undisputed that there was no medical reason to prolong Notter's maternity leave. Dr. Marion, Notter's treating physician, confirmed that Notter was physically able to return to work six weeks after her delivery and that she sought to extend her maternity leave because she wanted to spend additional time with her newborn daughter.

23

by group insurance, is determined by the attending physician in each case.

D. The Company has no arbitrary or pre-determined schedule for either the timing or duration of maternity leave of absence.

II. Administration

A. The employee will be asked to advise her supervisor promptly of any change in her condition which affects her job performance, and to provide as much advance notice as possible as to 1) the date she intends to begin her leave, and 2) her future plans to return to work or her expected date of return.

B. Maternity Leave of Absence will begin on the date on which the employee's attending physician specifies that she should no longer work and will continue until release by the attending physician. Both statements by the physician must be in writing.

J.A. 622 (emphasis added).

The majority accepts Notter's contention that under this policy her maternity leave was to continue until a written statement releasing her was obtained from her attending physician, Dr. Marion. Nevertheless, although section I.C. of the maternity leave policy specifies that the period of disability is determined by the physician, it plainly ties the permissible length of that period to the time during which the employee is unable to perform the duties of her employment and is eligible for disability benefits. Consequently, the only fair reading of the policy is that the physician's release must be based on the employee's medical ability to perform the duties of her position. Accordingly, while North Hand was not in strict technical compliance with the maternity leave policy--in the sense that it had not received Dr. Marion's written statement of release--North Hand nonetheless did not act in violation of Notter's rights under the policy because no medical reason existed for the extension of her leave, and North Hand

24

had been informed orally of this fact by Dr. Marion. Although Dr. Marion had not issued a written medical release (and, of course, North Hand could not force him to issue one) it is undisputed that he informed Beamguard and Notter that there was no medical reason for Notter not to return to work.[2] In view of this, the only reasonable basis on which to conclude that Notter elected not to return to work was not because of a medical reason, but because of her understandable desire to stay at home with her young child. Further, the maternity leave policy provided that the reinstatement and benefits eligibility provisions of the disability leave policy apply equally to maternity leave, and the disability policy expressly stated that a failure to return within five days of a medical release would be viewed as a voluntary termination.

The majority asserts that the question before the court is not whether North Hand's actions violated Notter's rights under the maternity leave policy. On the contrary, if the action North Hand took was permitted by the leave provisions, that action cannot amount to evidence of a discriminatory motive for the termination. Thus, the question of the proper interpretation of the leave provisions is critical to the resolution of this appeal. Further, the majority maintains that "Notter's reading of the policy was not strained and was firmly grounded in plain language to the effect that the attending physician determines the length of the leave." Supra p. 12 note 4. But, an interpretation of North Hand's policy to permit an employee to remain on maternity leave indefinitely simply because her doctor fails to return a written release form to the company and in the absence of any medical reason for continuation of the leave undoubtedly is strained, if not absurd.[3]

_____

[2] Dr. Marion's progress notes reflect that he spoke with Beamguard on March 8, 1992 and informed her that the extension of Notter's leave was not for medical reasons but for "bonding." J.A. 45, 636. Since Notter requested that Dr. Marion extend her leave for this reason, there is no question that she knew that her leave was not for medical reasons.

[3] Perhaps more fundamentally, the majority must acknowledge that Notter's interpretation of the leave policy is, in any event, irrelevant. Notter was required to prove that her termination resulted from a discriminatory action by North Hand; whether Notter subjectively believed that she was acting in compliance with the policy is immaterial to that question.

The majority also relies on the manner in which North Hand effected Notter's termination as support for its conclusion that the evidence is sufficient to sustain the verdict, arguing that an inference of discrimination can be drawn from the circumstances surrounding the dismissal. The majority first stresses that no one ever explained to Notter that her employment was in jeopardy or that she could have applied for a personal leave of absence. But, it is undisputed that North Hand did not have a duty to apprise Notter of this information, and Notter was unable to point to any similarly situated employee outside the protected class that had been so advised. As a result, I find no basis for an inference of discrimination from the failure of North Hand to advise Notter of these facts.[4] Next, the majority contends that Beamguard's repeated calls to doctors' offices and her acceptance of Dr. Raut's release demonstrate a discriminatory motive. To the contrary, these actions are compatible only with the nondiscriminatory motive offered by Beamguard--that of seeking to assist Notter in maintaining benefits by attempting to obtain the necessary information, and only after determining that she could not do so, taking the steps necessary to remove someone who was no longer entitled to disability benefits from its rolls. In my view, this evidence is far from sufficient to support a determination of discrimination.

In sum, the first three circumstances to which the majority and Notter point, while circumstantial evidence of an intent to discriminate, are insufficient by themselves to support a conclusion that North Hand's termination of Notter for violating company leave policies was a pretext for discrimination. And, since North Hand, in fact, did not violate Notter's rights under the maternity leave policy, the final two arguments to which the majority points provide virtually no support for a finding of pretext. In opposition to this evidence offered in support of a conclusion that North Hand's termination of Notter was discriminatory was evidence that Grigg had given Notter her highest performance rating after he learned that she was pregnant; that Beamguard voluntarily hostessed a baby shower--attended by Grigg--at the plant for Notter; and that other women had taken maternity leave and returned from leave without incident--including Notter's unwed

_____

[4] Moreover, it was undisputed that Beamguard told Notter that the excuse she provided was unacceptable and that Notter had a copy of the employment manual containing the leave provisions.

replacement. See Jiminez v. Mary Washington College, 57 F.3d 369, 384 (4th Cir.) (evidence that others in protected class are thriving is evidence of lack of discriminatory motive), cert. denied, 116 S. Ct. 380 (1995). Notter was unable to demonstrate that she had been treated less favorably, or differently, than anyone. And, finally, a much less sinister motive exists to explain North Hand's admittedly harsh treatment of Notter. Company officials feared that if the leave policy were not strictly enforced, North Hand would open itself to claims of discriminatory treatment by others in the future.[5] Viewed in the light most favorable to Notter, the evidence simply is not sufficient to support a finding that North Hand's proffered reason for terminating her was a pretext and that the true reason was discriminatory. See Benesh v. Amphenol Corp. (In re Wildewood Litig.), 52 F.3d 499, 502 (4th Cir. 1995) (explaining that this court reviews de novo a decision of the district court denying a motion for judgment as a matter of law and must affirm if there is substantial evidence, viewing it in the light most favorable to the nonmoving party, in the record from which the jury could find for that party). Therefore, I would reverse the decision of the district court denying North Hand's motion for judgment as a matter of law.

_____

[5] The majority contends that the company's argument that Notter's termination resulted from a straightforward application of its leave policy "would carry more weight if there were some evidence of how North Hand [had] applied the policy to previous employees in Notter's situation." Supra p. 12 note 4. In so stating, however, the majority illustrates exactly why it was essential for the company to apply the policy in this instance. If it had failed to do so, any attempt to apply the policy in the future potentially would expose it to a claim of disparate treatment. But, if it applied the policy consistently in the manner it did with Notter, its interpretation would be entitled to greater evidentiary value in the future.

27