**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2100**

KEITH WARD,

           Plaintiff – Appellee,

     v.

AUTOZONERS, LLC,

           Defendant – Appellant.

------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

           Amicus Supporting Appellee.

**No. 18-2170**

KEITH WARD,

           Plaintiff – Appellant,

     v.

AUTOZONERS, LLC,

           Defendant – Appellee.

----------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Amicus Supporting Appellant.

_____

Appeals from the United States District Court for the Eastern District of North Carolina, at New Bern.  Louise W. Flanagan, District Judge.  (7:15-cv-00164-FL)

_____

Argued:  September 20, 2019                    Decided:  May 11, 2020

_____

Before AGEE, FLOYD, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Floyd wrote the opinion in which Judge Agee and Judge Quattlebaum joined.

_____

**ARGUED:** Tracy Elizabeth Kern, JONES WALKER LLP, New Orleans, Louisiana, for Appellant/Cross-Appellee.  Rebecca Joan Houlding, Giselle Brianceschi Schuetz, FRIEDMAN & HOULDING LLP, Mamaroneck, New York, for Appellee/Cross-Appellant.  Phillip Matthew Kovnat, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.  **ON BRIEF:** Laurie M. Riley, JONES WALKER LLP, Miami, Florida, for Appellant/Cross-Appellee. Shilpa Narayan, FRIEDMAN & HOULDING LLP, Mamaroneck, New York, for Appellee/Cross-Appellant.  James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, Sidney A.R. Foster, Assistant General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

_____

FLOYD, Circuit Judge:

Before us is a matter arising from a jury verdict rendered in a sexual harassment case. In 2012, Defendant-Appellant/Cross-Appellee AutoZoners, LLC (AutoZone) hired Plaintiff-Appellee/Cross-Appellant Keith Ward as a part-time employee at its Whiteville, North Carolina store. Months later, the same AutoZone store hired Christina Atkinson. Shortly after she started working alongside Ward, Atkinson began groping him and engaging in sexually explicit language at work. Ward eventually quit and sued AutoZone, alleging violations of Title VII of the Civil Rights Act of 1964 and North Carolina law. A jury found AutoZone liable for creating a hostile work environment and for intentional infliction of emotional distress, and awarded both compensatory and punitive damages. AutoZone appealed, and Ward cross-appealed and conditionally cross-appealed, each raising a litany of issues. For the reasons set out below, we reverse the award of punitive damages for Ward's Title VII and state law claims and remand with instructions to the district court. However, as to AutoZone's duplicative recovery, jury instruction, and evidentiary error challenges, we affirm the district court.

I.

AutoZone is an automotive parts and accessories retailer and distributor with stores nationwide. On September 16, 2012, AutoZone hired Ward as a part-time commercial driver at its Whiteville, North Carolina store. Months later, around March 2013, it hired

3

Atkinson to work at the same store. Though Ward and Atkinson began with different roles at the store, they worked alongside each other.

Soon after she was hired, Atkinson began sexually harassing Ward. Many times, she not only made sexually offensive remarks toward Ward but also groped him. Once, for instance, Atkinson joked to Ward and Wanda Smith—a commercial sales manager who directly managed Ward and Atkinson and was responsible for the commercial section of the store—that she had performed oral sex on her husband for three hours the previous evening. Another time, Atkinson "dragged her . . . fingers" across Ward's buttocks, J.A. 504, and, a few days later, "grabbed [Ward's] nipple through [his] shirt and twisted it until [he] had a bruise," J.A. 508–09. At other times still, Atkinson grabbed Ward's crotch; "jiggled and squeezed" his buttocks in Smith's presence, J.A. 518; poked his nipples with a pencil; and shoved him into a shelf, pressed her head to his chest, and rubbed his nipple. Despite Ward's repeated requests, Atkinson did not stop.

AutoZone had a written sexual harassment policy while this happened, of course. As then written, the policy defined sexual harassment to include "sexual flirtations, advances, and propositions"; "requests for sexual favors"; "verbal abuse of a sexual nature"; "gestures or verbal comments about an individual's body"; "sexually degrading words"; or "the display of sexually suggestive objects or pictures in the workplace." J.A. 2067. It also required employees "who receive a complaint or become aware of any harassment" to "report it immediately to management" or other officials. J.A. 2067. And

4

AutoZone had a general reporting procedure for workplace issues, which included sexual harassment incidents. Generally, employees were to report such incidents to their immediate supervisor. Should an employee feel uncomfortable doing so or believe that their manager would inadequately respond to the incident, though, they could report it to "higher levels of management," like the store manager or district manager. J.A. 2070–71. In any event, management were to "thoroughly investigate[] each reported allegation." J.A. 2070–71. AutoZone also administered an online test to its managers to assess their knowledge regarding its sexual harassment policy.

AutoZone's sexual harassment policy, however, found little purchase at its Whiteville store. For one, handbooks describing the policy were not available at the store. Nor did AutoZone provide any in-person training on their sexual harassment policy. Instead, AutoZone required employees—managers and non-managers alike—to log in to a computer and "hit 'yes'" to verify that they had read the policy. J.A. 1201–02. Wayne Tarkington—a store manager who oversaw the Whiteville store and had hired Ward and Atkinson—testified that, though his responsibilities as store manager included ensuring that employees acknowledged that they "received" the policy, "or at least knew where it was at," it was "not [his] job" to ensure that they read it. J.A. 1201–02. Indeed, "99 percent of the people [did] not even read the policy," according to Tarkington, who also explained that he would illicitly log in to AutoZone's digital verification program and verify on behalf of other employees that they had read the policy. J.A. 1201. As for himself, Tarkington

had only read the policy during his first year at AutoZone and "basically all [he] knew about it" was that it was "zero tolerance." J.A. 1202. And the online test administered to managers would reveal correct answers at its end, so any failing manager could pass the test with little studying.

So, despite this policy, Ward found little success in reporting Atkinson's behavior to their superiors. When Ward first reported Atkinson's behavior to Smith, she failed to respond—despite AutoZone's policy requiring her to do so. When Ward complained to Smith that he was "sick and tired" of Atkinson "putting her hands" on him, J.A. 512–13, Smith replied: "Well, maybe if you'll give her what she wants, she'll leave you alone," J.A. 514. Ward then turned to Tarkington. After learning about Atkinson's behavior, Tarkington confronted Atkinson and admonished her to stop. But at the same time, Tarkington warned Ward to "knock it off," although no one had accused Ward of any misconduct. J.A. 1244–45. Tarkington also informed Kenneth Geer—a district manager who oversaw about a dozen AutoZone stores, including the Whiteville location—about Atkinson's conduct and his response to it. Yet, according to Tarkington, Geer did nothing. Atkinson thus continued unabated as Smith and Tarkington did little to stop her: one time, Smith laughed while watching Atkinson try to grab Ward's hand and put it in her pants pocket, after Atkinson had said that she was not wearing any underwear and that her pocket had a hole in it; another time, Tarkington just "sh[ook] his head" after Ward complained about Atkinson once more, J.A. 534.

6

About five months after Atkinson was hired, Lawrence McCall replaced Tarkington as the store manager. After Ward reported Atkinson to McCall, McCall assured Ward that Smith—who was present during this conversation and admitted that she had seen Atkinson touch Ward—would talk to Atkinson about her behavior the following day. Besides that assurance, McCall also confirmed that Smith was authorized to send Atkinson home for misconduct.

When Ward drove to work the next day, however, he saw Atkinson's car in the store's parking lot. So he drove away to draft a resignation letter, which he submitted later that day. Three days later, on August 19, 2013, Ward met with Geer to discuss possibly returning to work. During that conversation, Geer told Ward that "the whole thing [was Ward's] fault." J.A. 578. Because Ward was "a man," Geer continued, he "should have been able to . . . prevent[]" Atkinson's behavior. J.A. 578.

Ward did not return to AutoZone. According to Ward, Atkinson physically harassed him "at least [twenty] times, maybe a couple of dozen" in all, J.A. 795, and Ward reported her to Smith as many as twenty times between March and August 2013. Because of Atkinson's harassment, Ward suffered anxiety, stress, and chest pains, the latter of which required emergency medical attention and led to a heart catheterization.

So Ward sued AutoZone in the Eastern District of North Carolina. He alleged a hostile work environment on the basis of his sex,[1] constructive discharge, and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), as well as intentional infliction of emotional distress (IIED) under North Carolina law. The district court granted AutoZone summary judgment only on Ward's constructive discharge claim because AutoZone had not "deliberately made his working conditions intolerable in an effort to induce him to quit." J.A. 160 (alterations omitted) (quoting *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995)). Ward's remaining claims proceeded to trial.

On May 4, 2018, the jury returned its verdict. Though it rejected Ward's retaliation claim, the jury found AutoZone liable for the sexual harassment and IIED claims. For the sexual harassment claim, the jury awarded Ward $100,000 in compensatory damages and $600,000 in punitive damages. And for the IIED claim, it awarded Ward $150,000 in compensatory damages and $60,000 in punitive damages.

Post-judgment proceedings soon followed. In denying AutoZone's Renewed Motion for Judgment as a Matter of Law as to Ward's Title VII punitive damages, the district court rejected AutoZone's argument that no discriminating employee acted in a managerial capacity, concluding that a reasonable jury could have found that Smith, Tarkington, or Geer acted in the requisite managerial capacity and that Ward "produced

---

[1] Because the jury found AutoZone liable on this claim and it forms a large part of this appeal, references to Ward's "Title VII claim," "sexual harassment claim," or the like refer to this specific claim unless otherwise noted.

sufficient evidence that a managerial employee acted in reckless disregard of [his] federally protected rights." J.A. 2045–48. Yet the district court partly granted and partly denied AutoZone's Motion to Alter or Amend the Judgment. As to AutoZone's request to remit Ward's Title VII damages, the district court granted the motion and reduced the punitive damages award to $200,000, so that the total Title VII damages would fall within the mandatory $300,000 limit established by 42 U.S.C. § 1981a(b)(3)(D). As to AutoZone's request to vacate Ward's $150,000 compensatory damages award for his IIED claim, however, the district court denied the motion, concluding that Ward's Title VII and IIED damages awards did not constitute an impermissible double recovery.

Both parties timely appealed: AutoZone appealed, and Ward both cross-appealed and conditionally cross-appealed.

II.

We face a raft of issues on appeal. For its part, AutoZone argues that the district court erred in denying its Renewed Motion for Judgment as a Matter of Law because punitive damages were improper for Ward's Title VII claim and his IIED claim. As explained below, we agree and reverse the award of punitive damages.

In turn, AutoZone also argues that the district court erred in partially denying its motion to alter or amend the judgment because Ward's compensatory damages awards for his Title VII and IIED claim constituted an impermissible double recovery. And it argues

9

that the district court not only provided the jury with erroneous jury instructions but also committed a host of evidentiary errors below. However, we conclude the district court's resolution of these issues did not amount to reversible error and therefore affirm.

For his part, Ward, in his cross-appeal, argues that the district court erroneously granted summary judgment to AutoZone on his constructive discharge claim,[2] and, in his conditional cross-appeal, argues that, should we disturb the judgment below, he should be permitted to allocate his damages awards in a way that maximizes his monetary recovery.

III.

We begin with AutoZone's challenge to Ward's punitive damages awards. AutoZone contends that the district court erred in denying its Renewed Motion for Judgment as a Matter of Law because no bases for punitive damages exist for either Ward's Title VII claim or his IIED claim.

We review denials of motions for judgment as a matter of law de novo. *Legacy Data Access, Inc. v. Cadrillion, LLC*, 889 F.3d 158, 164 (4th Cir. 2018). Because the jury returned a verdict in Ward's favor, we view the evidence in the light most favorable to him, giving him the benefit of all reasonable inferences without weighing the evidence or assessing the credibility of any witnesses. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178,

---

[2] At oral argument, Ward's counsel explained that he does not desire a new trial solely on the constructive discharge claim, effectively waiving that claim. We therefore decline to address this issue.

10

196 (4th Cir. 2017). Put differently, if "reasonable minds could differ" regarding the jury's factual findings, we must affirm a district court's denial of a motion for judgment as a matter of law. *Id.*

With these standards in mind, we first consider punitive damages under Title VII before then considering them under North Carolina law.

A.

Title VII authorizes punitive damages only when a plaintiff makes two showings. First, the plaintiff must show that the employer "engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) . . . ." 42 U.S.C. § 1981a(a)(1). Second, the plaintiff must show that the employer engaged in the discriminatory practice "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). That is, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law[.]" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).

When a plaintiff relies on vicarious liability to hold an employer liable for punitive damages under Title VII, as Ward did, he must do so under traditional principles of agency law. Agency law provides only four ways an employer can be held vicariously liable for punitive damages based on the act of an employee: (1) when the employer authorizes the employee's tortious act; (2) when an employee is unfit and the employer acts recklessly in

11

employing the employee; (3) when the employee served in a managerial capacity and was acting within the scope of employment; or (4) when the employer or managerial agent of the employer ratified or approved the act. *Id.* at 542–43.

In response to AutoZone's Renewed Motion for Judgment as a Matter of Law and on appeal, Ward pursues vicarious liability under only the third of these four options, the managerial-capacity theory. He contends that AutoZone is vicariously liable for punitive damages based on the conduct of Smith, Geer, or Tarkington who, according to Ward, served in a managerial capacity and were acting within the scope of their employment. Ward also contends those alleged managers acted with malice and reckless indifference as required by 42 U.S.C. § 1981a(b)(1).

AutoZone, on the other hand, contends there is no evidentiary basis to support a finding that Smith, Geer, or Tarkington possessed the necessary managerial capacity to impute liability for punitive damages to AutoZone. AutoZone also argues there is no evidentiary basis to support a finding Smith, Geer, or Tarkington engaged in intentional discrimination with malice or reckless indifference.

For the reasons below, we agree with AutoZone that the evidence does not permit finding that Smith served in a managerial capacity. But, under our deferential standard of review, we conclude that there was evidence from which a reasonable jury could conclude Geer or Tarkington served in such a capacity.

Next, we agree with AutoZone that Ward failed to carry his burden of presenting sufficient evidence from which a reasonable jury could conclude that Geer or Tarkington engaged in an intentionally discriminatory practice with malice or reckless indifference. When an employee seeks to impute punitive damages vicariously to an employer based on the actions of a managerial employee acting within the scope of his employment, as Ward does here, he must introduce evidence that the alleged managers engaged in intentionally discriminatory practices themselves with malice or reckless indifference. *See, e.g.*, *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000) (holding evidence that the managerial employee intentionally refused to promote the plaintiff "in the face of a perceived risk that her decision would violate federal law" was sufficient to support a punitive damages award). The evidence here, even when viewed in the light most favorable to Ward and drawing all reasonable inferences in his favor, does not support such a finding.

1.

Onto the first inquiry. AutoZone first argues that it is not vicariously liable for punitive damages because there is not a sufficient evidentiary basis to support a conclusion that its employees Geer, Smith or Tarkington served in a managerial capacity. In determining whether an employee serves in a managerial capacity, courts must apply traditional agency principles. The Supreme Court explained in *Kolstad* that we must examine "the type of authority that the employer has given to the employee, the amount of

discretion that the employee has in what is done and how it is accomplished." 527 U.S. at 543 (internal quotation marks omitted). Though an employee must be important to act in a managerial capacity, they need not be the employer's top management, officer, or director to so act. *Id.* Determining whether an employee serves in a managerial capacity is thus a fact-intensive inquiry. *Id.*

Twenty years ago we applied these principles in *Lowery*. There, we affirmed portions of a judgment against Circuit City, concluding that punitive damages were appropriate because a reasonable jury could find that two Circuit City employees served in managerial capacities. 206 F.3d at 444–47. Regarding the first employee, we noted the employee managed an entire department at Circuit City. She was authorized to expand the department and did so from nine to twenty-one individuals. In addition, the employee had the authority to hire individuals to fill budgeted positions in the department in her sole discretion and could organize her department any way she wanted. *Id.* at 444. Concerning the second employee, we explained that employee managed an entire department of a Circuit City subsidiary such that approximately fifty people reported to the employee directly or indirectly. She was also able to make personnel decisions, including promotional decisions, "without any objective criteria or accountability." *Id.* at 447.

That said, we first consider Geer, who, as a District Manager for AutoZone, oversaw twelve stores, including the store where Ward worked. Geer had the authority to approve the promotion of an individual from part-time status to full-time status and to transfer an

14

employee from one store to another. Thus, the record contains sufficient evidence from which a reasonable jury could conclude that Geer served in a managerial capacity.

Tarkington is a closer call. As a Store Manager, Tarkington was essentially responsible for everything within "all four corners of the walls" of the store. J.A. 1199. He had the authority to hire employees, discipline them and to issue corrective action reviews. Tarkington also was responsible for enforcing AutoZone policies within the store. Yet under *Lowery*'s holding and based on our standard of review, we agree that there is sufficient evidence in the record from which the jury could reasonably conclude that Tarkington had the authority and discretion required for managerial capacity.

AutoZone's arguments to the contrary are unavailing. It mainly contends that Geer, Smith, and Tarkington cannot be managerial agents because they did not serve "in a higher managerial capacity." Br. Appellant/Cross-Appellee 41. But neither the Supreme Court nor this Court has cast the managerial capacity test in such stringent terms. In fact, the footnote in *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536 (4th Cir. 2003), that AutoZone cites to support its proposition simply restates our formulation from *Lowery*. *Id.* at 548 n.4 ("For an employer to be held vicariously liable for punitive damages, a plaintiff must also show that the discriminating employee served the employer in a managerial capacity and committed the intentional discrimination while acting within the scope of employment." (citing *Lowery*, 206 F.3d at 442)). Taken at face value, AutoZone's formulation encroaches on the Supreme Court's own enunciation of the managerial

15

capacity test in *Kolstad*, which noted that managerial agents need not be "top management, officers, or directors." 527 U.S. at 543. We find AutoZone's position without merit under the facts of this case.

By contrast, Smith's authority and discretion were far more circumscribed. Smith served as the Commercial Sales Manager for AutoZone's Whiteville, North Carolina store. Although that title may sound like it involves adequate managerial responsibilities, the record reveals her actual job duties did not. As a Commercial Sales Manager, Smith was responsible for "taking care of the customer." J.A. 1441. She received orders from commercial customers, pulled the parts for the orders and billed customers for the orders. To be sure, she could make recommendations about hiring and staffing, but she lacked the authority to hire or to fire an employee herself. To the extent that there was some evidence that Smith may have had the authority to send Atkinson home, this is a thin basis for a finding of managerial authority. Although the Tenth Circuit—in a case cited in *Lowery*—ascribed managerial authority to an employee who had the power to suspend subordinates and make hiring and firing recommendations, that court emphasized that the "power to make independent decisions regarding personnel matters or determine policy" were the key indicia of managerial authority. *Equal Emp't Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1247 (10th Cir. 1999) (internal quotation marks omitted).

Smith's oversight of certain employees was also insufficient to qualify her as a managerial employee. Although Ward and Atkinson reported to Smith in some ways, if

occasionally supervising two people creates sufficient managerial capacity, virtually all employees except those at the lowest levels of a company's hierarchy would qualify. Given Smith's very limited authority and discretion, we conclude that there is not a sufficient evidentiary basis for a reasonable jury to find Smith served in a managerial capacity under the standards articulated in *Kolstad* and *Lowery*.

Thus, AutoZone's vicarious liability for punitive damages, if any, must be based on Geer or Tarkington. But it is not enough that there was evidence to support the finding that these two employees were managers. In order to determine whether their conduct was sufficient to impute vicarious liability for punitive damages to AutoZone, they must also have engaged in intentional discrimination with malice or reckless indifference to Ward's federally protected rights.

2.

We turn next to the question of malice or reckless indifference. AutoZone argues that there is insufficient evidence to support a reasonable jury's finding that its managerial employees engaged in an intentionally discriminatory practice with malice or reckless indifference to Ward's federally protected rights. In response, Ward relies on Geer and Tarkington's failure to sufficiently respond to Ward's complaints to his satisfaction and their awareness of federal antidiscrimination laws. According to Ward, under *Kolstad* and

17

*Lowery*, this is enough to prove that Geer and Tarkington engaged in a discriminatory practice with malice or reckless indifference to Ward's rights.

Ward's argument overlooks the fact that he must first present sufficient evidence showing Geer or Tarkington *themselves* engaged in intentional discrimination in order to hold AutoZone vicariously liable for punitive damages. There does not appear to be any dispute about this requirement. The district court charged it below, J.A. 1960, and properly cited it in its order denying AutoZone's Renewed Motion for Judgment as a Matter of Law, J.A. 2045.

Further, the requirement that the manager engage in the intentional discrimination is mandated by our precedent. As we have previously explained, for a punitive damages award to be justified under a managerial capacity theory of vicarious liability, the evidence must be sufficient for a reasonable jury to find that the "employer's *decision maker*"—that is, the managerial employee—"discriminated in the face of a perceived risk that the *decision* would violate federal law." *Equal Emp't Opportunity Comm'n. v. Fed. Express Corp.*, 513 F.3d 360, 372 (4th Cir. 2008) (emphases added); *see id.* (observing that the jury must also find "[t]hat the decision maker acted within the scope of his employment *in making the challenged decision*" (emphasis added)).

Similarly, fundamental to the analysis in *Kolstad* and *Lowery* was the finding that the managers themselves allegedly engaged in intentional discrimination by failing to promote the plaintiffs on the basis of race or gender despite training that such

18

discrimination was prohibited by federal law. *Lowery* emphasized this point, describing *Kolstad*'s conclusion that:

> [T]he Court held that an employer may be held vicariously liable for a punitive damage award in a Title VII case for the intentionally discriminatory conduct of its employee, where the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment . . . .

*Lowery*, 206 F. 3d at 443; *see id.* at 445 (finding a manager "*intentionally refused* to promote [an employee] on account of race" (emphasis added)). In sum, such language supports the requirement that, under the managerial capacity theory of vicarious liability, the managers themselves must carry out the intentional discrimination.

Ward failed to present evidence that Geer or Tarkington—the alleged managerial employees—engaged in intentional discrimination. Instead, he presented evidence that Atkinson engaged in discrimination in the form of sexual harassment. But she was not a manager. And to the extent that Ward seeks to mix and match Atkinson's discriminatory conduct with Geer and Tarkington's managerial capacity, such a theory finds no support in the precedent from the Supreme Court or this Court. Any argument that *Kolstad* and *Lowery* support such a theory of liability ignores the key differences between the claims of discrimination asserted in *Kolstad* and *Lowery* and those asserted here. As discussed, *Kolstad* and *Lowery* support an employer's *vicarious liability* for punitive liability *when the manager carries out the intentional discrimination*. They provide no support for punitive damages liability when the employee who carries out the intentional

19

discrimination is not a manager and the alleged managers did not carry out the intentional discrimination.

The evidence Ward presented concerning Geer and Tarkington's role in the discrimination was their response to Ward's complaints about Atkinson. In certain circumstances, punitive damages may be appropriate where a managerial employee is apprised of a discriminatory situation, yet responds with reckless indifference to it despite his or her knowledge of the claim. That was the case in *Federal Express*, where there was evidence that a managerial employee—despite awareness of his obligation under the Americans with Disabilities Act (ADA) to provide reasonable accommodations for a subordinate's deafness disability—nonetheless repeatedly denied or permitted the denial of certain accommodations, and also refused the request of other supervisors to take steps towards accommodation.[3] Based on this, we concluded that "the trial evidence was sufficient for the jury to find . . . that a managerial official . . . perceived the risk that his failure to [reasonably accommodate the subordinate] would contravene the ADA." *Id.* at 374. Thus, the jury was entitled to find that the employer was vicariously liable because

---

[3] Specifically, among other actions, the managerial employee: (1) permitted two other supervisors to "continually den[y] or ignore [the subordinate's] repeated requests for, inter alia, complete notes at daily meetings, and [American Sign Language] translation . . . at his job interview, orientation training, and monthly meetings;" (2) required the subordinate to attend quarterly meetings yet failed to provide translation; (3) denied another supervisor's request for training on their employer's ADA compliance policy; and (4) despite ongoing knowledge of the subordinate's Equal Employment Opportunity Commission charge, failed to inform that subordinate's supervisor about it. 513 F.3d at 373.

its managerial employee had "acted, in *Kolstad*'s terms, with recklessness in the subjective form." *Id.* (internal quotation marks omitted). But even so, in *Federal Express*, the managerial employee was the employee directly involved in the discrimination—which in a Title VII ADA case is the decision about whether to provide accommodations. We find this fact to be critical and an important distinction between *Federal Express* and this case. Here, Geer and Tarkington, at most, failed to adequately respond to discrimination by a lower level non-managerial employee.

Further, there was a distinct intentionality on the part of the managerial employee in *Federal Express* that elevated the actions there above mere negligence to reckless indifference. *See Kolstad*, 527 U.S. at 536 (observing that malice or reckless indifference may be found "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference"); *cf. U.S. Equal Emp't Opportunity Comm'n v. Consol Energy*, 860 F.3d 131, 151 (4th Cir. 2017) (observing that the employer was not liable for punitive damages because evidence failed to show management "subjectively appreciated that its efforts [to accommodate] were inadequate"). By contrast, the evidence here, even when viewed in the light most favorable to Ward, does not support a showing that Tarkington or Geer engaged in intentional discrimination with reckless indifference to Ward's rights. According to Ward, he reported Atkinson's conduct directly to Tarkington in June and July 2013. Tarkington, in response, assured Ward he would speak with Atkinson. The uncontradicted evidence is that he did

21

so that same day, informing her of Ward's complaints and that he "wanted it to stop." J.A. 1212. He also reported Ward's concerns to his supervisor, Geer. Likewise, once news of Ward's concerns reached Geer, he ordered Ward and Atkinson separated, called Ward directly and planned to meet with Ward to address his concerns. And according to Ward, he agreed to meet with Geer because he understood Geer had "expressed a willingness to move . . . Atkinson to another store until any investigation [was] complete." J.A. 573.

A reasonable jury could have concluded that Geer and Tarkington might have done more in these circumstances to address Ward's concerns or perhaps acted sooner, especially given that Ward introduced evidence that Geer and Tarkington—who had knowledge of Atkinson's discriminatory conduct via Ward's complaints—failed to take measures that stopped Atkinson's conduct altogether. In fact, this evidence is sufficient for a reasonable jury to conclude that AutoZone is liable for *compensatory damages*. AutoZone's liability for *punitive damages*, however, is an entirely different issue.

At best, Geer and Tarkington were negligent, not recklessly indifferent. Ward introduced no evidence Geer or Tarkington themselves engaged in intentional discrimination or acted with reckless indifference or malice in addressing Ward's complaints. Unlike the manager in *Federal Express*, Tarkington and Geer began taking steps to address the situation, including by reporting the situation to other managerial employees and designing a plan to remedy it. Although a jury may have been entitled to determine these steps were inadequate, there was simply not sufficient evidence

22

demonstrating that Tarkington and Geer engaged in these steps with "subjective appreciation" of the inadequacy. Put another way, "the evidence, even construed most favorably to [Ward], simply does not suggest that the relevant [managerial employees] engaged in their [attempts to address the situation] in order to reach a [resolution] that they subjectively believed might violate Title VII." *Consol Energy*, 860 F.3d at 151. Thus, even when viewed in the light most favorable to Ward, the evidence is insufficient to show Geer or Tarkington intentionally engaged in a discriminatory practice.[4] Ward therefore failed to carry his burden of proof, which "is a high standard to meet." *Id.*[5]

---

[4] Unlike Ward's state law punitive damages claim, courts have found the burden of persuasion for Title VII punitive damages to be preponderance of the evidence. *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 805–06 (6th Cir. 2004) (citing *Notter v. N. Hand Protection*, *a Div. of Siebe, Inc.*, No. 95-1087, 1996 WL 342008, at *10 (4th Cir. 1996)). But even under this more lenient standard, there must be evidence in the record to support a finding that the conduct of Geer or Tarkington engaged in an intentionally discriminatory practice.

[5] The Second, Tenth and Eleventh Circuits also reject the proposition that punitive damages can be imputed to an employer based solely on negligence by management level employees. *See, e.g.*, *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2nd Cir. 2015) (holding "[t]he only conduct that can be imputed to [the employer] that [the employee] alleges was 'malicious' or 'recklessly indifferent' was [a supervisor's] alleged failure to act after [the employee] complained to her about the discrimination," yet noting that "even if this fact could establish an employer's liability for co-worker harassment, it does not, by itself, warrant an award of punitive damages"); *McInnis v. Fairfield Communities, Inc.* 458 F.3d 1129 (10th Cir. 2006) ("[B]efore a company is held liable for *punitive* damages for acts of harassment by low-level employees, there [must] be some culpability beyond mere negligence *at the management level*.") (quoting *Danco, Inc. v. Wal–Mart Stores, Inc.*, 178 F.3d 8, 18 (1st Cir. 1999)); *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 491 (11th Cir. 1996) ("[C]onsidering the plain language of the statute and the limited case law, we conclude that, at least ordinarily, constructive knowledge alone is insufficient to authorize the award of punitive damages under section 1981a.").

Punitive damages are an extraordinary remedy. *Harris*, 132 F.3d at 982; *see also Consol Energy*, 860 F.3d at 150–51 (observing that "[p]unitive damages are allowed in a Title VII action only under limited circumstances" that present "a high standard to meet"). Both "the text and background of the Civil Rights Act of 1991, which authorizes punitive damages, emphasize that this extraordinary remedy is not to be awarded automatically in every successful Title VII suit." *Harris*, 132 F.3d at 982. "Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award." *Kolstad*, 527 U.S. at 534. Imposing punitive damages in the case of the mere knowledge of Atkinson's conduct and negligent failure to act would conflate Title VII's carefully crafted standards for liability for compensatory damages and punitive damages, thereby imputing liability to an employer in virtually every hostile work environment case based on a theory of negligence.

Altogether, considering the precedent from the Supreme Court and this Court, and after reviewing the manner in which other courts of appeals have addressed this issue, in our view, a party seeking to hold an employer vicariously liable for punitive damages based on the theory that employees served in a managerial capacity must establish more than that manager-level employees negligently failed to adequately respond to complaints of harassment. He must show that the managerial employees engaged in an intentionally

24

discriminatory practice themselves with malice or reckless indifference.[6]  The evidence here does not make that showing.

B.

Our conclusion that punitive damages under Title VII were improper does not end our sojourn into the topic of punitive damages, however, for AutoZone also argues that the district court erred by allowing the jury to award punitive damages for Ward's North Carolina IIED claim.

North Carolina law also allows a plaintiff to recover punitive damages in certain limited circumstances.  Under Chapter 1D of the North Carolina General Statutes:

> Punitive damages may be awarded only if the claimant proves the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>
> (1) Fraud.
>
> (2) Malice.
>
> (3) Willful or wanton conduct.

---

[6] As noted above, an employee can also seek to impute vicarious liability to an employer for punitive damages by showing the employer authorized the discriminatory practice, recklessly employed the discriminating non-managerial employee or ratified or approved an intentionally discriminatory practice.  Though the record here does not appear to support any of those theories, Ward did not advance them so we will not address them either.

25

N.C. Gen. Stat. § 1D-15(a). The existence of an aggravating factor must be proved by clear and convincing evidence. N.C. Gen Stat. § 1D-15(b). Punitive damages may only be awarded against a corporation if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." N.C. Gen. Stat. § 1D-15(c).

This standard for punitive damages under North Carolina law is distinct and separate from the standard for punitive damages under Title VII in at least two ways. First, the burden of proof for proving punitive damages under North Carolina law is higher than the burden of proof for proving punitive damages under Title VII. As mentioned above, the existence of an aggravating factor under North Carolina law must be proved by clear and convincing evidence. N.C. Gen. Stat. § 1D-15(b). By contrast, under Title VII, reckless indifference need only be proved by a preponderance of the evidence. As the North Carolina Supreme Court has explained, "[the clear and convincing standard] is more exacting than the preponderance of the evidence standard generally applied in civil cases, but less than the beyond a reasonable doubt standard applied in criminal matters." *Scarborough v. Dillard's, Inc.*, 693 S.E.2d 640, 643 (N.C. 2009) (internal quotation marks omitted). "The clear and convincing standard requires evidence that should fully convince." *Id*. (internal quotation marks omitted).

Second, North Carolina's definition of willful or wanton conduct differs markedly from Title VII's definition of reckless indifference. Under North Carolina law, Chapter

26

1D defines willful or wanton conduct as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen. Stat. § 1D-5(7). North Carolina courts have explained that willfulness and wantonness is more than mere carelessness or recklessness. *Shaw v. Goodyear Tire & Rubber Co.*, 737 S.E.2d 168, 173 (NC. Ct. App. 2013).

In *Vandevender v. Blue Ridge of Raleigh, LLC*, 901 F.3d 231 (4th Cir. 2018), this Court, applying North Carolina law, elaborated on the meaning of willfulness and wantonness. In doing so, we observed that though willful or wanton conduct does not require proof of malicious intent, it does require proof of the conscious and intentional disregard of and indifference to the rights and safety of others. *Vandevender*, 901 F.3d at 240. Applying this standard, this Court found that the defendants acted willfully and wantonly when they deliberately disregarded their legal duty to their patients, placing them at greater risk of injury or death, in order to increase profits. *Id*.

Under North Carolina's standard, there is no sufficient evidentiary basis for a reasonable jury to conclude Geer or Tarkington participated in or condoned willful or wanton conduct, especially under the applicable clear and convincing standard. Stated differently, clear and convincing evidence does not show that Geer or Tarkington consciously disregarded Ward's rights. As described above, the record indicates that Geer

27

and Tarkington both acted in some fashion to address Ward's concerns. The record evidence, even viewed most favorably to Ward, does not "fully convince" that they participated in or condoned willful or wanton conduct under North Carolina law. *See id.*

IV.

We depart from the issue of punitive damages and arrive at the issue of duplicative recovery. AutoZone argues that the district court erred in denying its motion to alter or amend the judgment because Ward's Title VII compensatory damages are duplicative of his IIED compensatory damages. We disagree, and affirm the district court's denial of AutoZone's motion.

We review a district court's denial of a motion to alter or amend a judgment under an abuse-of-discretion standard. *See Dennis v. Columbia Colleton Medical Ctr., Inc.*, 290 F.3d 639, 653 (4th Cir. 2002).

A "widely accepted prohibition on duplicative damages" exists. *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 637 F.3d 454, 460 (4th Cir. 2011). A plaintiff, then, "may not receive a double recovery under different legal theories for the same injury." *Id.* For its part, AutoZone argues that Ward's Title VII and IIED claims arise from the same injury. Because Ward stated in his Complaint that these claims arose from AutoZone "knowingly permitting a sexually hostile work environment," J.A. 28, AutoZone's argument goes,

28

Ward's compensatory damages constitute a double recovery, as both claims are meant to compensate for his emotional distress.

But we are obliged "to determine whether a jury verdict can be sustained, on any reasonable theory." *Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors, Inc.*, 99 F.3d 587, 599 (4th Cir. 1996) (internal quotation mark omitted) (quoting *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1246 (Fed. Cir. 1989)). Rooted in the deference accorded to juries in our constitutional tradition, this obligation requires us to harmonize a seemingly inconsistent verdict "if there is any reasonable way to do so" before we may disregard a jury's verdict. *Id.*

Here, the verdict is reconcilable. In denying AutoZone's motion, the district court explained that the standards for awarding compensatory damages under Title VII and North Carolina law differ. Under the former, the jury was instructed to award nominal or actual damages depending on the proof of physical or emotional injury, the latter of which was referred to as "emotional distress." J.A. 1958–59. Under the latter, however, the jury was instructed that conduct must have "in fact caused severe emotional distress." J.A. 1972–73. The verdict does not clarify whether the jury awarded compensatory damages only for emotional distress, rather than, say, physical injury too. So it is reasonable to infer that the jury chose to compensate Ward for his physical injuries (like his heart problems) under one claim and chose to compensate him for his emotional injuries (like his anxiety and stress) under another. Therefore, the district court did not abuse its discretion in denying

29

AutoZone's motion to alter or amend the judgment as to Ward's compensatory damages awards. We therefore affirm the district court in this respect.

V.

We next consider AutoZone's challenges to the district court's jury instructions. Though AutoZone offers a few purported errors, all lack merit.

We review challenges to jury instructions under an abuse-of-discretion standard. *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) ("The party challenging the jury instructions faces a heavy burden, for 'we accord the district court much discretion' to fashion the charge." (quoting *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994))). "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge," *id.* (quoting *Henderson v. Kibbe*, 431 U.S. 145, 153 n.10 (1977)), so "we simply determine whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party," *id.* (internal quotation marks omitted) (quoting *Bailey v. Cty. of Georgetown*, 94 F.3d 152, 156 (4th Cir. 1996)).

As a result, a district court reversibly errs in refusing to give an instruction proposed by a party "only when the requested instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so

30

important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Id.* at 586–87 (internal quotation marks omitted) (quoting *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010)).

First, AutoZone argues that the instructions charged the jury to consider the harassment or complaints of other employees. Because no such harassment or complaints existed, AutoZone contends, these instructions were erroneous. This is an imaginative reading of the instructions. Consider one part of the instructions that AutoZone objects to: "Additionally, in determining whether defendant should have known about Christina Atkinson's sexual harassment directed at plaintiff, you may consider *whether* . . . other employees made complaints of sexual harassment against Christina Atkinson." J.A. 1953–54 (emphasis added). Another part states: "Accordingly, *if* the offending conduct was directed at other employees of defendant . . . ." J.A. 1952 (emphasis added). These excerpts, like all the relevant instructions, do not presuppose that other employees were harassed or that they complained. Rather, they are conditionally phrased. *If*, Meriam-Webster's Collegiate Dictionary (11th ed. 2003) ("[I]n the event that . . . on condition that."); *Whether*, Meriam-Webster's Collegiate Dictionary (11th ed. 2003) ("[A]n indirect question involving stated or implied alternatives."). That is, the instructions guide the jury's considerations only if the jury first finds that the requisite condition exists. They are not misleading or confusing, and they adequately inform the jury of the controlling legal principles at issue.

31

Second, AutoZone takes umbrage with the instructions about a hostile work environment. Per AutoZone, these instructions are erroneous because they failed to include language regarding the significance of the alleged harasser's status—that is, whether the harasser was a co-worker or a supervisor. But the instruction stated: "The status of the harasser is also relevant in measuring the severity of the harassing or discriminatory conduct." J.A. 1951. The thrust of AutoZone's argument—that the status of the harasser is relevant—was precisely what the instructions conveyed. Given that we "have always left the choice between generality versus specificity in the charge . . . to the sound discretion of the trial courts," *Noel*, 641 F.3d at 590 (internal quotation marks omitted) (quoting *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1295 (4th Cir. 1995)), we cannot conclude that these instructions were erroneous.

Lastly, AutoZone argues that the jury instructions erroneously failed to include language stating that an employer can only be charged with constructive knowledge if the employer failed to provide reasonable channels to complain. Yet the district court included an entire instruction about the knowledge and constructive knowledge element of Ward's sexual harassment claim. Once more, this argument amounts to a plea for greater specificity to otherwise accurate jury instructions.

In all, the district court did not abuse its discretion in its chosen jury instructions. Construing the instructions in their entirety, they plainly and accurately discuss both claims and their corresponding damages and thus adequately inform the jury of the controlling

32

legal principles involved in Ward's Title VII and state-law claims. We therefore affirm the district court with respect to AutoZone's challenge to the jury instructions.

VI.

We arrive at the remaining issue. AutoZone argues that the district court committed various evidentiary errors that merit reversal of the judgment below.

We review a district court's application of the Federal Rules of Evidence (FRE) under an abuse-of-discretion standard, and we review its interpretations of such rules de novo. *In re C.R. Bard, Inc. MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*, 810 F.3d 913, 923 (4th Cir. 2016). Even if a district court commits an evidentiary error, however, we will not disturb its judgment if the error was harmless. *See Creekmore v. Maryview Hosp.*, 662 F.3d 686, 693 (4th Cir. 2011); *see also* Fed. R. Civ. P. 61.

A threshold issue merits addressing here. AutoZone contends that the cumulative-error doctrine applies to the purported evidentiary errors. That doctrine requires that the district court's judgment be set aside if the district court's evidentiary errors, even if individually harmless, "so fatally infect the trial" when aggregated that they violate the trial's "fundamental fairness." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)). However harmful a sole error may have been, AutoZone argues, the errors in the aggregate certainly violated the trial's fundamental fairness.

33

Yet we have generally only applied the cumulative-error doctrine in criminal cases. A circuit split as to the doctrine's applicability in civil cases exists,[7] and we have not precedentially determined whether it so applies. *Gemaehlich v. Johnson*, 599 F. App'x 473, 476 n.2 (4th Cir. 2014) (acknowledging lack of Fourth Circuit precedent); *Anthony v. Ward*, 336 F. App'x 311, 322 (4th Cir. 2009) (assuming without deciding it applies in civil context). Assuming without deciding that the doctrine applies in civil cases, though, disturbing the district court's judgment on this ground would nevertheless be inappropriate. The parties had the opportunity to present their critical pieces of evidence, such as relevant non-impeachment evidence. Our review of the record convinces us that whatever evidentiary errors, if any, may have existed, they did not so fatally infect the trial as to render it fundamentally unfair. Finding no reversible error, we affirm the district court's rulings as to AutoZone's various evidentiary challenges.

VII.

---

[7] Apparently, the First, Second, Sixth, Seventh, Eighth, Ninth, and Federal Circuits apply the cumulative-error doctrine in civil cases. *See, e.g.*, *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir. 2013); *Jerden v. Amstutz*, 430 F.3d 1231, 1240–41 (9th Cir. 2005); *Nichols v. Am. Nat'l Ins.*, 154 F.3d 875, 889–90 (8th Cir. 1998); *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998); *Malek v. Fed. Ins.*, 994 F.2d 49, 55 (2d Cir. 1993); *Hendler v. United States*, 952 F.2d 1364, 1383 (Fed. Cir. 1991). By contrast, the Third Circuit has rejected it in civil cases. *See SEC v. Infinity Grp. Co.*, 212 F.3d 180, 196 (3d Cir. 2000).

For the foregoing reasons, we affirm the district court's disposition of AutoZone's challenges with respect to duplicative recovery, the jury instructions, and any evidentiary errors. But we reverse the district court's denial of AutoZone's Renewed Motion for Judgment as a Matter of Law with respect to punitive damages. We remand the matter to the district court to determine of the final amount of Ward's compensatory damages award under his Title VII claim.[8]

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

---

[8] In the August 22, 2018 order, the district court reduced the total damages award on Ward's Title VII claim from $700,000 to $300,000. J.A. 2052. In doing so, the district court did not specify whether it reduced the original compensatory damages award of $100,000 and punitive damages award of $600,000 proportionally or disproportionately. Accordingly, we remand to the district court to specify the final award of Title VII compensatory damages, not to exceed the jury award of $100,000. The compensatory damages award of $150,000 for the North Carolina IIED claim is unaffected. Based on the grounds of our decision, there is no basis for Ward's argument to otherwise reallocate the judgment amounts.