**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-2142**

DAVID L. DUVALL,

Plaintiff – Appellee,

v.

NOVANT HEALTH, INC.,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  David Shepardson Cayer, Magistrate Judge.  (3:19-cv-00624-DSC)

Argued:  December 7, 2023                    Decided:  March 12, 2024

Before AGEE and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Agee wrote the opinion in which Judge Quattlebaum and Senior Judge Floyd joined.

**ARGUED:**  Stephen Montgomery Cox, ROBINSON, BRADSHAW & HINSON, PA, Rock Hill, South Carolina, for Appellant.  S. Luke Largess, TIN FULTON WALKER & OWEN, Charlotte, North Carolina, for Appellee.  **ON BRIEF:**  Charles E. Johnson, Angelique R. Vincent-Hamacher, Travis S. Hinman, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina; Benjamin R. Holland, Margaret Santen Hanrahan, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Charlotte, North Carolina, for Appellant.

AGEE, Circuit Judge:

After a week-long trial, a North Carolina jury found that Novant Health, Inc. terminated David Duvall because of his race, sex, or both, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. In addition to the finding of liability, the jury awarded Duvall $10 million in punitive damages. Novant Health moved under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law and to set aside the punitive damages award, arguing that the evidence adduced at trial was insufficient to support the jury's verdict. It also opposed Duvall's competing motion for back pay and front pay, claiming that he failed to mitigate his damages. Following a hearing, the district court denied Novant Health's motion for judgment as a matter of law; granted in part and denied in part Novant Health's motion to set aside the jury's award of punitive damages, reducing the award to the statutory maximum of $300,000 but otherwise finding punitive damages appropriate; and granted Duvall's motion for back pay and front pay. Novant Health now appeals.

After a careful review of the record, we hold that sufficient evidence was presented at trial to sustain the jury's finding of liability but not its award of punitive damages. We also find that the district court did not abuse its discretion in awarding Duvall back pay and front pay. Accordingly, we affirm in part, vacate in part, and remand for entry of an amended judgment consistent with this opinion.

# I.

## A.[1]

Duvall, a white man, began working for Novant Health in 2013, when Executive Vice President and Chief Consumer Officer Jesse Cureton, a black man, hired him as Senior Vice President of Marketing and Communications. Based in North Carolina, Duvall reported directly to Cureton and held the same position throughout his employment with Novant Health. Evidence presented at trial demonstrated that Duvall performed exceptionally in his role, receiving strong performance reviews and gaining national recognition for himself and the marketing program he developed for Novant Health. Despite all that, Cureton fired Duvall in July 2018, a decision that came as a shock to both Duvall and his colleagues. Moreover, Novant Health—a multibillion-dollar company with tens of thousands of employees and an extensive human resources department—had *no* record of any documented criticism of Duvall's performance or reasons for his termination.

Immediately after firing Duvall, Novant Health elevated two of Duvall's deputies, a white woman and a black woman, to take over his duties. It then later hired another black woman to permanently replace Duvall.

Believing Novant Health fired him merely to achieve racial and gender diversity— or more specifically, to hit certain diversity "targets," J.A. 1431—within its leadership,

---

[1] We accept and recite the facts in the light most favorable to the nonmoving party, Duvall, as we must in reviewing a post-trial Rule 50(b) ruling. *First Union Com. Corp. v. GATX Cap. Corp.*, 411 F.3d 551, 556 (4th Cir. 2005).

Duvall sued his former employer under Title VII and North Carolina state law in federal district court. The case proceeded to trial, where a jury heard the following evidence.

1.

In 2015, Novant Health President and Chief Executive Officer ("CEO") Carl Armato appointed Tanya Blackmon as Senior Vice President of Diversity and Inclusion ("D&I") to develop a "Diversity and Inclusion Strategic Plan" for Novant Health (the "D&I Plan"). J.A. 1365–78. That D&I Plan, which Novant Health's Executive Team[2] approved, consisted of three phases: Phase 1 ("Learn and Engage") would assess Novant Health's D&I culture, benchmark its D&I levels, and seek to get Novant Health's Board and leadership to commit to using D&I in decision-making. J.A. 1365. Phase 2 ("Develop and Influence") would set goals to "embed diversity and inclusion" in three to five years, with a commitment to "adding additional dimensions of diversity to the executive and senior leadership teams" and establishing "a system wide decision making process that includes a diversity and inclusion lens." J.A. 1365–66. And Phase 3 ("Leverage") would evaluate the progress toward embedding D&I and "implement strategies and tactics to close identified gaps." J.A. 1368.

In November 2016, Blackmon, who had since been promoted to Executive Vice President and Chief Diversity and Inclusion Officer, presented a "Business Case" for the D&I Plan to Novant Health's Board. J.A. 160, 1327–64. That presentation established a

---

[2] The Executive Team consisted of "the president and CEO and executive vice presidents of the company." J.A. 242.

4

timeline to develop D&I metrics and "[i]ntentionally integrate" D&I in 2017; to evaluate those metrics and Novant Health's use of a "[D&I] lens" in decision-making in 2018; and to fully "embed[]" D&I by 2019. J.A. 1364. Novant Health's Board approved the Business Case and its D&I Plan timeline.

In February 2018, Novant Health's Diversity and Inclusion Executive Council ("D&I Council"),  the body responsible for overseeing and implementing the D&I Plan and whose members included Blackmon, Cureton, and Duvall, held its first meeting. At that meeting, the D&I Council discussed various models for measuring the success of Novant Health's D&I efforts.

The D&I Council next met in May 2018 and continued its discussion of D&I metrics. In doing so, the council reviewed demographic data on Novant Health's workforce and leadership, which showed a decline in female leaders from 2015 to 2017 (except on the Executive Team). It also showed that while 82 percent of Novant Health's workforce was female, only 4 percent of the female workforce comprised Novant Health's leadership. The data further revealed "a higher representation of whites among leadership versus [the] workforce," J.A. 1420, and in particular an increase in white male representation "with each level of management," J.A. 1426. Conversely, the data reflected that "African-American representation in management decrease[d] at each level [of management] with the exception of the executive team." J.A. 1423.

In October 2018, shortly after Cureton terminated Duvall's employment, the D&I Council met again. The minutes from that meeting documented the D&I Council's "Philosophy": "Our team members should reflect our communities. Our leadership should

5

reflect our team members and ultimately we want Novant Health's overall workforce to reflect the communities we serve." J.A. 1430. The minutes also detailed several "comments and questions" from Novant Health employees concerning the company's D&I push and its impact on hiring practices. J.A. 1430. Some asked how to "balance" hiring based on D&I and hiring based on qualifications or skill, while others raised the issue of "quot[a]s and targets." J.A. 1430–31. In addition to offering suggested responses to such hiring-related comments and questions, the minutes recorded the following declaration:

> We, Novant Health, are not interested in meeting quotas; quotas are mandated by someone outside of your organization. We want to reach our targets, targets are set by the organization, which is within our strategic imperatives and making sure our work force reflects the community we serve.

J.A. 1431.

In February 2019, the D&I Council presented a report prepared by an outside consulting group and titled "Diversity & Inclusion (D&I) Metrics Framework" to Novant Health's Board. J.A. 1432. The report stated that the first two phases of the D&I Plan had "seen great success in using qualitative and quantitative data as drivers to measure and track progress" and that Novant Health "aim[ed] to be more explicit on how D&I impacts overall business performance." J.A. 1435 (emphases omitted). The report indicated that although Novant Health had made "[p]rogress" in "increas[ing] Black/African American representation in leadership roles," the company still had a gap in black leadership as compared to industry benchmarks and census data. J.A. 1442. To address that gap, the report recommended a "3-4 percentage point increase" in black leaders over the next three years. J.A. 1449.

6

The same February 2019 report also identified remaining gaps in Hispanic leaders and in the Hispanic and Asian workforce and likewise recommended explicit targets to close those gaps. In response, Novant Health adopted a long-term financial incentive plan that tied executive bonuses, in part, to achieving specific percentages of those groups in the workforce by 2021.

Finally, in September 2019, Blackmon prepared a Phase 3 report that summarized the D&I Plan's progress. The report showed a 3.9 percent decrease in the white workforce and a 5.6 percent decline in white leaders from 2016 to 2019, compared to a 2 percent increase in the black workforce and a 0.9 percent increase in black leaders over the same period. The report also reflected a 21.1 percent increase in female leaders from 2018 to 2019 alone.

2.

Duvall enjoyed much success as Novant Health's communications and marketing head. Having earned a master's degree from Northwestern University Kellogg School of Management and founded his own healthcare marketing agency, Duvall brought considerable knowledge and experience to Novant Health when he was recruited to be the company's Chief Marketing and Communications Officer in 2013. And he put that knowledge and experience to good use at Novant Health.

Most notably, Duvall, who had inherited a "very decentralized" marketing program at Novant Health, J.A. 607, developed a centralized marketing program for the company— effectively Novant Health's own "marketing agency," J.A. 608—and hired new talent to help implement it. Duvall's program achieved measurable success for Novant Health's

7

brand, receiving praise from members of Novant Health's Executive Team, including Armato and Chief Operating Officer David Jeff Lindsay. Duvall later presented his program at national conferences, where it was likewise lauded by marketing officials in the healthcare industry. On top of that, he and his team won several marketing and public relations awards on behalf of Novant Health.

Duvall also received strong annual evaluations throughout his tenure at Novant Health. Cureton's 2016 annual review of Duvall, for example, stated that Duvall "continues to le[a]d and build his teams focused on improving patient and consumer growth and impact"; that he "brings operational structure, and process to our marketing strategy"; that he "[a]lways meets with stakeholders for feedback and collaboration"; and that Cureton could *not* identify any "opportunities for development" for Duvall. J.A. 1526. Duvall also received excellent "Engagement" scores, which were derived from survey responses from other Novant Health employees, including those who reported directly to Duvall. J.A. 1583–84.

Nonetheless, on July 30, 2018—during Phase 2 of the D&I Plan—Cureton called Duvall into a conference room and fired him. At the time, Cureton told Duvall simply that Novant Health was "going in a different direction." J.A. 649. With no prior indication that his job was in jeopardy, Duvall was understandably "perplexed." J.A. 1633. And he wasn't the only one. After Cureton circulated an internal memo announcing Duvall's abrupt termination, several employees, including other members of management, expressed their shock at the news.

8

Despite what Cureton told Duvall at the time, and despite a total lack of *any* contemporaneous documentation reflecting shortcomings in Duvall's performance, Cureton testified at trial (over three years later) that he fired Duvall because he lacked "engagement" and "support from the executive team." J.A. 864. He said that Duvall first damaged his credibility with the company in 2016, when he "froze" and "walked off" stage while giving a presentation to Novant Health's Board, Executive Team, senior leadership, and "community boards," requiring Cureton to step in and continue the presentation on Duvall's behalf. J.A. 396. Aside from this incident, Cureton said that Duvall had declined opportunities to speak before the Board and instead delegated that responsibility to his subordinates. He also testified that Duvall was absent from two important meetings in 2018.

Duvall's evidence, however, painted quite a different picture.

As to the 2016 presentation, Duvall testified that he began feeling "nauseous and lightheaded," "very dizzy" and "very faint," J.A. 619, so he briefly stepped away and sat down to regroup. Then, after two doctors present at the meeting examined him, Duvall returned to the stage and finished the presentation. Afterward, Cureton sent a text message to Duvall saying that "everything's okay" and that the team "did great." J.A. 620. According to Duvall, that was "the last time it was ever discussed." J.A. 620. He was never reprimanded or even counseled about the incident. Nor was he told that he had lost the confidence of Novant Health's leadership as a result of that incident.

Concerning Duvall's absences from the two management meetings, both were the product of known and previously existing scheduling conflicts. The first absence was due

9

to a presentation that Duvall was already scheduled to give on Novant Health's marketing program at a national conference, a speaking engagement Cureton knew about and approved beforehand. The second absence was due to a family reunion for which Duvall's work calendar showed prescheduled time off. And on both occasions, Duvall had arranged for others on his team to attend the meetings and give presentations in his absence. He did not receive any complaints, warnings, or even cautionary advice about the conflicts or the performance of his team until the time of trial in this case.

Finally, Duvall presented deposition testimony from Shane Grady, an executive recruiter for Johns Hopkins who spoke to Cureton about Duvall in December 2018, a few months after Duvall's termination. As reflected in Grady's contemporaneous notes, Cureton spoke very highly of Duvall and praised his performance at Novant Health. When asked why Duvall was let go, Cureton responded that there had been "[l]ots of change in [the] last 12 months regarding executive leaders and others" and that there was a "desire to bring in new leaders"—a desire "for a different point of view," for a different "flair." J.A. 311. Cureton assured Grady that the decision was "not a reflection of [Duvall's] doing a poor job." J.A. 311. In fact, Cureton told Grady that he "would hire [Duvall] again." J.A. 312.

But Cureton did not hire Duvall again. Instead, Novant Health elevated two of Duvall's deputies to take over his duties, effectively splitting Duvall's old position into two. The company promoted Kati Everett, a white woman, to Senior Vice President of Communications. And it appointed Tammy Jones, a black woman, to serve as Senior Vice President of Marketing on an interim basis while Novant Health conducted a national

10

search for a permanent replacement. At the time, Novant Health rated Jones a lower performer than Duvall. *See* J.A. 417. Roughly ten months later, the company hired Vicky Free, a black woman, to serve as Senior Vice President of Marketing. Free was one of three finalists for the position; the other two finalists were also black women.

Notably, Duvall was not the only white male executive terminated and replaced by a racial minority during Phase 2 of the D&I Plan. Four months earlier, Cureton had fired Rick Brajer, a white man whose job performance as Senior Vice President of Business Strategy received a "high potential and medium performance" rating. J.A. 402. Cureton then assigned Brajer's duties to a black male employee.[3]

### 3.

After he was fired, Duvall "started to look for other work." J.A. 654. In September 2018, he was contacted by a recruiter for Henry Ford Health System in Detroit, Michigan, and the two parties began employment discussions. As those discussions played out over the next several months, Duvall was also contacted by recruiters for four other interested employers: Johns Hopkins, the University of Michigan, the University of Miami, and Minnesota Fairview. Due to financial and other considerations, Duvall chose to focus on

---

[3] Following Brajer's and Duvall's terminations, Cureton also fired Hayes Woollen, another white man, eliminating his role altogether and reassigning his duties elsewhere. In fact, the jury heard uncontested evidence that Cureton went from seven white male direct reports in 2018, to two in 2019, to one in 2020, to zero at the time of trial in 2021. Of these seven white men, Cureton fired four, including Duvall, Brajer, and Woollen. Cureton testified that the fourth white man he fired was replaced by another white man. He also testified that the remaining three white male direct reports were reassigned to another supervisor, after which one voluntarily quit and one was fired by someone other than Cureton.

11

the opportunities with Henry Ford and Johns Hopkins and withdrew from consideration by the other three.

In April 2019, Henry Ford formally offered Duvall the newly created position of Senior Vice President of Public Relations, Marketing, Communications & Chief Experience Officer.[4] Duvall accepted the job and started work that June, receiving a substantially higher base salary than what he received at Novant Health as well as a sizable relocation award and sign-on bonus.

But Duvall's time at Henry Ford didn't last long. Although the uncontested record shows that Duvall performed well in his role, he was fired seven months later. Duvall's firing came on the heels of his filing this lawsuit against Novant Health in November 2019, which garnered significant media attention. Days after filing suit, Henry Ford's CEO summoned Duvall to his office for "the most hostile, berating conversation [Duvall had] ever had." J.A. 662. Referring to the litigation, the CEO asked Duvall how he could "do such a thing." J.A. 662. He told Duvall that he didn't "believe" that Henry Ford was "the right environment" for him and that there was "a lot of damage repair" he was "going to have to do." J.A. 662. Weeks later, Henry Ford fired Duvall. In its separation agreement with Duvall, Henry Ford specified that it had terminated his employment "*without cause*." J.A. 1690 (emphasis added).

---

[4] Before he accepted the position with Henry Ford, Duvall also interviewed with Johns Hopkins.

12

Now twice fired within eighteen months, Duvall started looking for work again. In short order, he was contacted by recruiters for four interested employers: Brigham and Women's/Mass General, Westchester Medical Center, Ohio State University, and Cape Fear Medical Center. Duvall withdrew from consideration by Cape Fear given its comparatively small size, choosing instead to focus on the other three opportunities. But none of them panned out: After Duvall gave each recruiter a "high level . . . overview of [his] current situation"—namely, his termination from Novant Health and resulting lawsuit and his correlated termination from Henry Ford—the recruiter responded that he or she would "get back to [him]" if the respective employer had any interest in further pursuing him as a candidate. J.A. 666–67. Duvall never heard back from any of them.

B.

Following the district court's denial of the parties' cross-motions for summary judgment, the case proceeded to trial.[5] The trial lasted seven days and included ten witnesses and over 100 exhibits. Before the case was submitted to the jury, Novant Health orally moved for judgment as a matter of law on all claims. The district court denied the motion. The jury then returned a liability verdict for Duvall, finding that his race and/or sex was a "motivating factor" in Novant Health's decision to fire him and that the company had not shown that it would have made the same decision regardless of his race and/or sex, and awarded him $10 million in punitive damages. J.A. 1138.

---

[5] At the outset of the litigation, the parties consented to jurisdiction by a magistrate judge, and the case was assigned to Magistrate Judge David S. Cayer. For ease of reference, we refer to the magistrate judge as the "district court."

13

Novant Health then filed a renewed motion for judgment as a matter of law and a motion to set aside the jury's punitive damages award, both under Federal Rule of Civil Procedure 50(b). Meanwhile, Duvall filed a motion for equitable relief, seeking back pay and front pay. Novant Health opposed that motion, arguing that Duvall didn't make reasonable efforts to mitigate his damages in seeking new employment.

In August 2022, the district court entered an order that (1) denied Novant Health's renewed motion for judgment as a matter of law; (2) granted in part and denied in part Novant Health's motion to set aside punitive damages, reducing the award to the statutory maximum of $300,000 but otherwise finding punitive damages to be supported by the evidence; and (3) granted in part Duvall's motion for equitable relief in the form of back pay and front pay. *Duvall v. Novant Health Inc.*, No. 3:19-CV-00624-DSC, 2022 WL 3331263 (W.D.N.C. Aug. 11, 2022). Consistent with that order, the court entered judgment in Duvall's favor. On Duvall's motion, the court later issued an amended judgment that recalculated the amount of back pay and prejudgment interest and also awarded Duvall attorney's fees and costs. *Duvall v. Novant Health Inc.*, No. 3:19-CV-00624-DSC, 2022 WL 11271199 (W.D.N.C. Oct. 19, 2022).

Novant Health timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

II.

We begin with Novant Health's claim that the district court erred in denying Rule 50(b) relief. According to Novant Health, insufficient evidence was presented at trial to sustain the jury's finding of liability and its award of punitive damages. We disagree with

14

Novant Health on the issue of liability, but we find merit in its argument as to punitive damages.

We review a district court's denial of a Rule 50(b) motion de novo. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 196 (4th Cir. 2017). In doing so, we view the evidence in the light most favorable to the nonmoving party—here, Duvall—and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Only if, after doing all that, we find that "the *only* conclusion a reasonable jury could have reached is one in favor of the moving party" will we disturb the judgment below. *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 610 (4th Cir. 2021) (emphasis added) (cleaned up). As such, the moving party "faces a steep hurdle." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 722 (4th Cir. 2019). Indeed, it will not do to merely show that "reasonable minds could differ" as to the jury's findings, for even then we must affirm. *Bresler*, 855 F.3d at 196; *see also Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 599 (4th Cir. 1996) ("An appeals court is abjured to determine whether a jury verdict can be sustained, *on any reasonable theory*." (emphasis added) (cleaned up)).

## A.

In this case, Duvall advanced a mixed-motive theory of liability under 42 U.S.C. § 2000e-2(m), which provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

15

As the Supreme Court has explained, a mixed-motive plaintiff faces "a lessened causation standard" than but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013). For he need only provide sufficient direct or circumstantial evidence demonstrating that his protected characteristic was a *motivating factor* in the defendant's challenged employment practice. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003). If he does so, "the employer cannot escape liability." *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005).[6]

So the question here is whether Duvall presented sufficient evidence (direct or circumstantial) for a reasonable jury to have found that his race and/or sex played a motivating factor in Novant Health's decision to fire him. Like the district court, we answer that question in the affirmative.

To begin, Duvall presented evidence about the context surrounding his termination. The jury heard that Duvall was fired in the middle of a widescale D&I initiative at Novant Health, which sought to "embed diversity and inclusion throughout" the company, J.A. 1365, and to ensure that its overall workforce, including its leadership, "reflect[ed] the communities [it] serve[d]," J.A. 1430. There was evidence presented that Novant Health endeavored to accomplish this goal by, among other things, benchmarking its then-current D&I levels and developing and employing D&I metrics; committing to "adding additional

---

[6] Although the employer's *liability* is established upon the requisite showing, "if an employer can demonstrate that it 'would have taken the same action in the absence of the impermissible motivating factor,' it can restrict a plaintiff's *damages* to injunctive and declaratory relief, and attorney's fees and costs." *Diamond*, 416 F.3d at 317 (emphasis added) (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).

dimensions of diversity to the executive and senior leadership teams" and incorporating "a system wide decision making process that includes a diversity and inclusion lens," J.A. 1366; and evaluating the success of its efforts and identifying and closing any remaining diversity gaps.

The jury also heard about the demographic data from 2015 and 2017 that Novant Health collected. From a factual standpoint, the data revealed a decline in female leaders and an overrepresentation of male and white leadership in comparison to the total workforce. It also showed an increase in white male representation "with each level of management," J.A. 1426, compared to a decrease in "African-American representation . . . at each level [of management] with the exception of the executive team," J.A. 1423. By 2019, however, Novant Health saw a dramatic increase in female leaders just from the year prior (the period in which Duvall was fired). It also reflected a decrease of white workers and leaders and an increase in black workers and leaders over the life of the D&I Plan. Additionally, after remaining gaps in the Hispanic and Asian workforce were identified, Novant Health adopted a long-term financial incentive plan that tied executive bonuses to closing those gaps by achieving a specific percentage of each group.[7]

---

[7] Novant Health argues that evidence of these race-based bonuses is irrelevant as the financial incentive plan instituting them was not formally adopted until after Duvall was fired. It further argues that in any event, the bonuses related only to furthering the goal of increasing the Hispanic and Asian workforce, a goal that would not have been furthered by Duvall's firing since he was replaced by a black woman. But we do not think that either fact would preclude a jury from properly considering this evidence. It was all part of the same D&I Plan, and a jury could reasonably see these race-based bonuses as a formal recognition of a preexisting policy of using race in decision-making.

17

Against that backdrop, we consider the evidence specific to Duvall and his termination.

As noted above, there was substantial evidence at trial that Duvall performed superbly in his role at Novant Health. The jury heard how he transformed Novant Health's marketing program, earning him high praise both internally—including from the CEO himself—and nationally; how Novant Health's marketing department won several awards under his leadership; and how Duvall's strong annual reviews were reflective of his success. Not even Novant Health disputes this evidence. *See* Opening Br. 7 ("In some respects, Duvall's performance met or exceeded Novant Health's expectations during his tenure. He helped develop a method of insights and analytics to assess Novant Health's marketing efforts, spoke at national conferences, and headed a marketing team that won national awards. Consistent with these accomplishments, Duvall's written performance reviews were generally positive."); *see also* J.A. 328–29 (Cureton testifying that Duvall was "a complement to our strategy" and that he "had, overall, done a good job for our organization").

But despite this evidence of his exceptional performance, the jury heard that Duvall was abruptly fired, having been told only that Novant Health was "going in a different direction." J.A. 649. It also heard that this news came as a shock to both him and several Novant Health employees, including other members of management. He was then immediately replaced by two women. One of these women, who took over Duvall's marketing duties on an interim basis, was a racial minority and was rated a lower performer than Duvall. Novant Health then hired another black woman, Free, to step into that

18

marketing role on a permanent basis. Free was one of three finalists for that position—all black women. All of this happened during Phase 2 of the D&I Plan, an express goal of which was to "[c]ommit to adding additional dimensions of diversity to the executive and *senior leadership* teams." J.A. 1366 (emphasis added). On top of that, the jury heard evidence that just a few months before firing Duvall—and still during Phase 2 of the D&I Plan—Cureton fired Rick Brajer, another white employee who was performing well, and assigned his duties to a black male employee. A jury would be entitled to consider this evidence as suggestive of calculated moves to increase diversity among Novant Health's senior leadership by removing white men.[8]

Finally, the jury heard Cureton offer shifting, conflicting, and unsubstantiated explanations for Duvall's termination. Cureton testified that he fired Duvall because he lacked "engagement" and "support from the executive team." J.A. 864. But those were not the reasons he gave Duvall at the time, and neither Cureton nor anyone else at Novant Health, a multibillion-dollar company with ample employee-relation resources, could produce *any* contemporaneous evidence documenting these supposed deficiencies in Duvall's performance—or indeed, any deficiencies at all. We have previously held that such circumstances are indicative of pretext for unlawful discrimination. *See Jacobs v.*

---

[8] Additionally, as indicated above, Cureton later fired at least one other white male direct report, Woollen, despite no record evidence of poor performance. Duvall, Brajer, and Woollen comprised seven of the white men that reported directly to Cureton in 2018. By the time of trial, Cureton had zero white male direct reports. Although a jury could have credited Cureton's explanation for these occurrences, it also could have viewed this evidence as further proof of a larger effort to remove white men.

*N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 576 (4th Cir. 2015) (reversing summary judgment award to the employer where "many of the purported justifications were not raised at the time of termination" and the employer did not document "*any* of the justifications . . . in any way"). And we see no reason to reach a different conclusion here.

What's more, the jury's consideration was not limited to Novant Health's failure to produce any corroborating evidence; it also saw evidence presented by Duvall that directly contradicted Cureton's undocumented assertions at trial. For example, despite Cureton's claim that Duvall lacked engagement, the jury saw evidence that Duvall had excellent "Engagement" scores at the time he was fired. In fact, Duvall not only scored higher than the average score among Novant Health's leadership—he scored higher than *Cureton*. Additionally, although at trial Cureton pointed to an (undocumented) incident where Duvall stopped speaking midway through a presentation in 2016 as well as Duvall's absence from two meetings in 2018, the jury heard evidence from Duvall that explained why these claims were misleading. Duvall testified, for instance, that the 2016 incident was due to sudden-onset illness, that he later finished the presentation, and that he was never reprimanded or otherwise told that he had damaged his credibility with Novant Health's leadership as a result of that incident. And he further testified, without contradiction, that the missed meetings in 2018 were due to previously known scheduling conflicts for which he ensured someone was available and prepared to cover his absence. It was well within the jury's prerogative to choose which version of events to believe.

Even more consequential, the jury heard the deposition testimony of a corporate recruiter, Grady, who spoke to Cureton about Duvall a few months after his firing. That

20

testimony presented a very different narrative than the one offered by Cureton at trial. According to Grady, Cureton said that Duvall was *not* terminated due to his performance. In fact, Cureton spoke very highly of Duvall's performance and went so far as to say that he "would hire [Duvall] again." J.A. 312. Cureton instead attributed Duvall's termination to "[l]ots of change in the last 12 months regarding executive leaders and others," a "desire to bring in new leaders," and "a desire for a different point of view, [a] different . . . flair." J.A. 311. As we have said before, "[t]he fact that an employer has offered different justifications at different times for an adverse employment action is, in and of itself, probative of pretext." *Jacobs*, 780 F.3d at 576 (cleaned up).

Based on Cureton's uncorroborated and conflicting justifications for Duvall's termination, a jury could reasonably conclude that Cureton's asserted reasons at trial—that Duvall lacked "engagement" and "support from the executive team," J.A. 864—were merely "post hoc rationalizations invented for the purposes of litigation," *Jacobs*, 780 F.3d at 576, and therefore "unworthy of credence," *Reeves*, 530 U.S. at 147. And if a jury could rationally find that Novant Health's justifications were false, then it could also infer that Novant Health was "dissembling to cover up a discriminatory purpose." *Id.*; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("[R]ejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination[.]" (emphasis omitted)).[9]

---

[9] Novant Health nonetheless argues that Duvall's discrimination claim is doomed because he purportedly "admitted that Cureton had not discriminated against him and had no discriminatory animus." Opening Br. 5. But what Duvall actually said was that he did
(Continued)

* * * *

In sum, the jury heard evidence that Duvall performed well in his role but was nonetheless fired and replaced, at one point or another, by three women, two of whom were racial minorities, amid a substantial D&I initiative that called for remaking Novant Health's workforce to reflect a different racial and gender makeup. And it also heard conflicting and uncorroborated reasons for Duvall's termination. Viewing this collective evidence in the light most favorable to Duvall, as we must, we do not find that "the *only* conclusion a reasonable jury could have reached is one in favor of [Novant Health]." *Drummond Coal Sales, Inc.*, 3 F.4th at 610 (emphasis added) (cleaned up). Quite the opposite. There was more than sufficient evidence for a reasonable jury to determine that Duvall's race, sex, or both motivated Novant Health's decision to fire him. Novant Health's arguments to the contrary, which largely seek a reweighing of the evidence, are unconvincing. Therefore, we affirm the district court's order denying Novant Health's Rule 50(b) motion regarding liability.[10]

_____

not "feel that [he] had ever been discriminated against *while* [*he was*] *working there*" and that "*when* [*Cureton*] *fired* [*him*], [he] did [not] feel that he was firing [him] out of *personal racial animus*." J.A. 653 (emphases added). Such testimony is in no way inconsistent with his validated theory that he was fired to further Novant Health's D&I Plan. *Cf. Lightner v. City of Wilmington*, 545 F.3d 260, 263–64 (4th Cir. 2008) (finding Title VII discrimination claim meritless where the plaintiff "repeated[ly] admi[tted]" that "the real reason for his suspension was to cover up department wrongdoing," not because of his race or gender).

[10] To be clear, employers may, if they so choose, utilize D&I-type programs. What they cannot do is take adverse employment actions against employees based on their race or gender to implement such a program. And as recounted above, the evidence presented at trial in this case was more than sufficient for a reasonable jury to conclude that is precisely what Novant Health did to Duvall.

B.

The jury's award of punitive damages, however, is a different matter.

A successful Title VII plaintiff may recover punitive damages, but only in limited circumstances:

> Title VII authorizes punitive damages only when a plaintiff makes two showings. First, the plaintiff must show that the employer engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact). Second, the plaintiff must show that the employer engaged in the discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual. That is, an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law.

*Ward v. AutoZoners, LLC*, 958 F.3d 254, 263 (4th Cir. 2020) (cleaned up). Put more simply, the plaintiff must show *both* unlawful intentional discrimination *and* that the employer discriminated despite perceiving a risk of unlawfulness. This "is a high standard to meet." *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 151 (4th Cir. 2017).

In light of our discussion above, Duvall has met the first of the required showings—that Novant Health unlawfully intentionally discriminated against him. However, he has failed to meet his burden on the second showing, which requires evidence that the employer discriminated "in the face of a *perceived* risk that its actions [would] violate federal law." *Ward*, 958 F.3d at 263 (emphasis added) (citation omitted).

At bottom, Duvall's defense of the jury's award of punitive damages hinges predominantly on a single inference: that as a "highly educated . . . executive with a long career in corporate America," Cureton must have understood that Title VII prohibits firing

23

an employee because of his race or gender such that his termination of Duvall's employment necessarily entailed acting in the face of a perceived risk of violating Title VII. Response Br. 59. The district court relied on the same inference when denying Novant Health's Rule 50(b) motion on this point.

While it is true, as Duvall points out, that we have previously "found evidence sufficient to support a jury finding of a perceived risk in cases where the employer's managerial agent had at least a rudimentary knowledge of the import of a federal anti-discrimination statute," we have done so only where *affirmative evidence* of that rudimentary knowledge was presented at trial. *E.E.O.C. v. Fed. Express Corp.*, 513 F.3d 360, 372–73 (4th Cir. 2008) (citing cases where specific evidence of the decision-maker's knowledge was presented). And Duvall provided no such affirmative evidence here. He offered no evidence as to the training or qualification that Novant Health offered to or required of Cureton, or a comparable executive, to establish the requisite knowledge of federal anti-discrimination law. Duvall even cross-examined Cureton yet never elicited from him testimony establishing his personal knowledge of federal anti-discrimination law, let alone that he perceived a risk that his decision to fire Duvall would violate it.

Duvall doesn't contest this lack of direct evidence. He instead relies solely on an inference that Cureton had the requisite knowledge given his career as a corporate executive.[11] But Duvall hasn't identified any case in which this Court, or any other, has

---

[11] Prior to joining Novant Health, Cureton served as a corporate executive at Bank of America for several years.

24

affirmed an award of punitive damages based solely on that kind of inference. That's not surprising. After all, "[p]unitive damages are an extraordinary remedy." *Ward*, 958 F.3d at 269. And we are not persuaded that extraordinary remedy is proper here merely because Cureton is a "highly educated . . . executive with a long career in corporate America." Response Br. 59. Indeed, to affirm the punitive damages award on that basis alone would water down the "high standard" imposed on a Title VII plaintiff, *Consol Energy, Inc.*, 860 F.3d at 151, and contradict Congress's clear directive that punitive damages are "not to be awarded automatically in every successful Title VII suit," *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997).

It was Duvall's burden to come forward with sufficient evidence at trial that Cureton acted "in the face of a perceived risk that [his] actions [would] violate federal law." *Ward*, 958 F.3d at 263 (citation omitted). Based on our review of this record, Duvall failed to meet that high burden. Accordingly, the jury's award of punitive damages must be set aside.

## III.

Finally, we address Novant Health's claim that the district court erred in awarding Duvall front pay and back pay because he failed to reasonably mitigate his damages.

We review awards of back pay and front pay for abuse of discretion, *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651 (4th Cir. 2002), and the findings of fact on which such awards are based for clear error, *Taylor v. Home Ins. Co.*, 777 F.2d 849, 860 (4th Cir. 1985).

25

Back pay and front pay are equitable remedies generally available to a successful Title VII plaintiff. 42 U.S.C. § 2000e-5(g)(1). In order to receive either, however, the plaintiff must have mitigated his damages "by diligently seeking and accepting new employment substantially equivalent to that from which he was discharged." *Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001) (cleaned up); *see also Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985) ("[A] Title VII plaintiff cannot remain idle after an unlawful discharge and receive back pay for that period where he was not actively seeking employment."). But this duty to diligently seek new work "is not without limits." *Miller*, 250 F.3d at 838. As we have explained, "a plaintiff need not go into another line of work, accept a demotion, or take a demeaning position." *Id.* (cleaned up). And while the duty to mitigate rests with the plaintiff, the burden to show that the plaintiff failed to fulfill that duty rests with the defendant. *Id.*

Here, the district court found that Duvall satisfied his duty to mitigate damages. The question we must now decide is whether that factual determination is clearly erroneous. *See Consol Energy, Inc.*, 860 F.3d at 149. We conclude it is not.[12]

---

[12] Because Duvall was fired from Henry Ford "without cause," J.A. 1690, his termination did not affect his eligibility for back pay from that point to the date of judgment. *Cf. Brady*, 753 F.2d at 1277 ("[A] Title VII claimant must . . . use reasonable diligence to maintain any suitable employment which is secured. To permit otherwise would force the Title VII defendant to pay for the misconduct of a claimant in subsequent employment."). We are therefore concerned with two separate periods of time requiring mitigation: (1) the period between Duvall's firing at Novant Health and his hiring at Henry Ford; and (2) the period between his firing at Henry Ford and the date of judgment.

In claiming otherwise, Novant Health raises two principal arguments: (1) Duvall didn't actively apply for jobs but merely waited for work to come to him; and (2) Duvall turned down certain job opportunities.

Novant Health's first argument takes too simplistic a view of the record. The record contained uncontradicted evidence supporting why Duvall sought new employment in the way he did. In particular, Duvall testified that for executive positions "at [his] level," simply "apply[ing]" for jobs is not typical. J.A. 1976. Instead, he testified, "the predominant way that . . . executives are placed" is through "executive search"—that is, through the use of executive recruiters. J.A. 665–66. That testimony was unrebutted by Novant Health and finds ample support in the record. Within two months of his termination from Novant Health, Duvall was contacted by executive recruiters for five different employers interested in potentially hiring him, ultimately leading to his better-paying position at Henry Ford. Likewise, shortly after he was fired from Henry Ford, Duvall received calls from recruiters for four other employers. Further still, Novant Health itself used an executive recruiter to find and hire both Duvall and his replacement, Free.

Given Duvall's unrebutted testimony combined with the obvious success he (and Novant Health) had through executive recruiters, Novant Health's complaint that Duvall "technically didn't apply" for positions, J.A. 1936, is misleading and ignores the practical reality of the applicable executive job market as described in the record without contradiction. Novant Health's utter failure to identify any opportunities for comparable employment that Duvall could have pursued by "applying" for them in the traditional sense only underscores this fact. *See Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1139 (5th

27

Cir. 1988) ("[The] employer must demonstrate that comparable work was available and the claimant did not seek it out."). It is also disingenuous to suggest, as Novant Health does, that Duvall merely sat on his hands until employment found him. As the district court found, Duvall consulted trade journals for executive openings and networked with his connections on LinkedIn for potential employment opportunities. And the record shows that when he was contacted by executive recruiters, Duvall actively engaged in extensive and good-faith discussions with those recruiters. Thus, we simply are not persuaded by Novant Health's generalized assertion that Duvall could have done more. *See Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983) ("A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous[.]").[13]

Novant Health's second argument—that Duvall is precluded from back pay and front pay because he turned down certain job opportunities—fares no better.

Shortly after Duvall was fired by Novant Health, he was contacted by recruiters for five separate employers: Henry Ford, Johns Hopkins, the University of Michigan, the University of Miami, and Minnesota Fairview. For entirely sensible reasons recounted in

---

[13] Moreover, we have no reason to question the district court's finding that Duvall's job-search efforts were negatively impacted because of this lawsuit. In particular, the district court credited Duvall's testimony that (1) he was fired from Henry Ford "weeks after the CEO there learned that he had sued [Novant Health]," and (2) "three executive recruiters for substantially comparable opportunities" "ceased communications with [Duvall] after learning of this lawsuit and his short tenure at [Henry Ford]." *Duvall*, 2022 WL 3331263, at *13. Such evidence is a relevant consideration in assessing Duvall's mitigation efforts.

28

his unrebutted deposition and trial testimony, Duvall ultimately withdrew from consideration by the latter three employers and pursued the Henry Ford and Johns Hopkins opportunities. Duvall's decision paid off as it landed him a higher-paying job with Henry Ford. In those circumstances, we fail to see the unreasonableness of Duvall's course of action.

The same goes for Duvall's decision to withdraw from consideration as to the Cape Fear opportunity following his termination from Henry Ford. The district court found, and Novant Health fails to rebut, that Cape Fear was a mere fraction of the size of Novant Health in terms of both revenue and staff. As our cases make clear, the duty to mitigate does not require a plaintiff to accept "inferior" work that could "injuriously affect [his] future career or reputation in his profession." *Williams v. Albemarle City Bd. of Educ.*, 508 F.2d 1242, 1243 (4th Cir. 1974); *see also Miller*, 250 F.3d at 838 (explaining that "a plaintiff need not . . . accept a demotion[] or take a demeaning position" (cleaned up)). Novant Health responds that because Duvall faced an "extended" period of unemployment, he "had a burden to lower his sights and seek the best job available." Reply Br. 26 (cleaned up). But as the district court found, Duvall turned down the Cape Fear "shortly after his separation from [Henry Ford], not after an 'extended period' of looking unsuccessfully for work." *Duvall*, 2022 WL 3331263, at *13 (citation omitted). In addition, Duvall was still exploring opportunities with three other employers at the time, further illustrating that his

29

decision not to pursue the Cape Fear opportunity did not establish a failure to mitigate. Simply put, therefore, Novant Health's argument is meritless.[14]

In light of the record before us, we cannot say the district court clearly erred in finding that Duvall exercised reasonable diligence in seeking new employment, both after his termination from Novant Health and after his termination from Henry Ford. Accordingly, we affirm the district court's award of back pay and front pay.

IV.

For the reasons explained above, we affirm in part and vacate in part the district court's judgment and remand the case for entry of an amended judgment as to punitive damages and for such further proceedings deemed appropriate by the district court.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*

---

[14] We also note that the district court observed that much of Duvall's post-Henry Ford job search took place during the COVID-19 pandemic.

30